948 P.2d 592

**WINDWARD MARINE RESORT, INC., North Bay Boat Club, Inc. and Ralph A. Schrader, Appellants–Appellants,**

**v.**

**Jan Naoe SULLIVAN,[1] Director of the Department of Land Utilization, City and County of Honolulu, and Zoning Board of Appeals, City and County of Honolulu, Appellees–Appellees.**

**No. 17338.**

Intermediate Court of Appeals of Hawai'i.

Oct. 27, 1997.

1. Pursuant to Hawai'i Rules of Appellate Proce-

dure Rule 43(c)(1), Jan Naoe Sullivan, the cur-

rent director (the director) of the Department of Land Utilization of the City and County of Honolulu, has been substituted for Donald A. Clegg, the director at the time this case was decided by the Zoning Board of Appeals (the ZBA).

Wm. Patrick O'Connor, Honolulu, on the briefs, for appellants–appellants.

Thomas P. Rack, Deputy Corp. Counsel, on the brief, for appellee–appellee Director of the Dept. of Land Utilization, City and County of Honolulu.

Nalani P. Wilson–Ku, Deputy Corp. Counsel, on the joinder, for appellee–appellee Zoning Bd. of Appeals, City and County of Honolulu.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

We hold that under the Revised Charter of the City and County of Honolulu (Revised

Charter) § 6–909 the Appellee–Appellee Zoning Board of Appeals of the City and County of Honolulu (the ZBA) may not issue cease and desist orders for violations of the Land Use Ordinance, Honolulu, Haw., Rev. Ordinances (LUO) ch. 21 (1990), but is restricted to either "sustain[ing]" or denying appeals from orders issued by the Appellee–Appellee director (the director) of the Department of Land Utilization of the City and County of Honolulu (the DLU).

Thus, we vacate the July 2, 1993 first circuit court (the court) order insofar as it sustains that part of the May 14, 1992 ZBA order directing Appellants–Appellants Windward Marine Resort, Inc. (Windward, Inc.), North Bay Boat Club, Inc. (North Bay), and Ralph A. Schrader (Schrader) (collectively Windward) to cease and desist from engaging in certain conduct.

We conclude, however, that the court did not reversibly err in affirming that part of the ZBA order which, while ordering Windward to "cease and desist," essentially upheld the director's order prohibiting Windward from conducting commercial "aquatic activity" except for bona fide guests of its hotel.

### I.

The property involved is described as TMK[2] No. 4–7–10:56 (Lot 56). Lot 56 is located on Lihikai Drive in Kahalu'u, on the island of Oahu[3] and has access to Kāne'ohe Bay by way of a canal. Schrader purchased Lot 56 in 1964 and developed apartment units on the lot.[4] At that time the district in which Lot 56 is located was zoned as a Rural Hotel Apartment district.

In 1969, the district was rezoned from a Rural Hotel Apartment to an H–1 Resort Hotel (H–1) district under the newly adopted Comprehensive Zoning Code, Honolulu, Haw., Rev. Ordinances (CZC) ch. 21 (1969).

The purpose of the CZC was to "implement the purpose and intent of the General Plan[5] ... by encouraging the most desirable use of land[.]" CZC § 21–1.2. The CZC established zoning districts designated on zoning maps. CZC § 21–18. Such zoning maps, prepared by the director, became effective upon adoption by ordinance. CZC § 21–1.9. The zoning designations on the maps constituted the zoning classification of all parcels shown on the map. *Id.*

In 1977 Windward, Inc. was created to operate Lot 56's apartment units as a hotel (the hotel). In conjunction with its operations, Windward, Inc. provided small rowboats and sailboats to its guests. Windward,

---

2. Although not stated in the record, we assume that "TMK" means "Tax Map Key" and refers to the parcel as identified on maps prepared by the State of Hawai'i Department of Taxation pursuant to Hawai'i Revised Statutes (HRS) § 246–9 (1993).

3. Kahalu'u is located in the City and County of Honolulu, State of Hawai'i.

4. Appellant-Appellant Ralph A. Schrader (Schrader) states, in his amended opening brief, that at the time of the purchase he was acting as the general partner of Pioneer Enterprises and Libbyville Development Company. The director's notice of order appealed to the ZBA refers to Schrader as the "owner." This was not contested and therefore, for purposes of our opinion we treat Schrader as the owner of Lot 56.

Schrader acquired four lots, TMK 4–7–10–48, 49, 50, and 56, and an undivided interest in another, TMK 4–7–10–75 (the canal lot). A covenant running with the canal lot provided for the passage and docking of boats by those lot owners entitled to use the canal.

Apartment rental units were developed on lots 48, 49, and 50. Pursuant to the 1985 settlement agreement discussed *infra*, Lots 48, 49, and 50, and the buildings situated thereon, were designated as nonconforming apartment use.

The use of Lots 48, 49, 50, and 75 is not the subject of this appeal.

5. County general plans are mandated by the Hawai'i State Planning Act, HRS ch. 226 (1993), as part of "a statewide planning system [which serves] to coordinate and guide all major state and county activities and to implement the overall theme, goals, objectives, policies, and priority guidelines" of the Hawai'i State Planning Act. HRS §§ 226–51 and –52(a)(4). Among other things, county general plans "shall indicate desired population and physical development patterns for each county and regions within each county[.]" HRS § 226–52(a)(4).

Inc. also shuttled customers to and from the United States Marine Corps Base in Kāne'ohe in a fourteen-passenger van.

In 1981 Windward, Inc. applied for a Coastal Zone Management Permit[6] to expand its facilities and to make other improvements. In 1983 the Honolulu city council (the city council) denied this request.

Windward, Inc. subsequently filed suit against the director, the Building Department of the City and County of Honolulu (Building Department), the DLU, and the city council (collectively the City), alleging irregularities in the processing of Windward, Inc.'s applications and in the refusal to grant it certain permits.

In May 1983, North Bay was incorporated for the purpose of "provid[ing] small boats and other marine apparatus to guests and tenants living at [the hotel] and to [its] members [and t]o provide instruction in the safe use of this equipment."

On March 1, 1984, Lot 56's district was rezoned from an H–1 to an R–6 Residential (R–6) district.

On August 1, 1985, the lawsuit between Windward and the City was settled by a letter agreement. This agreement acknowledged, in part, that Lot 56 was in nonconforming hotel use[7] "pursuant to permits that have been issued and shall be designated as such in the future." A nonconforming use of

land was defined, in part, by the CZC as "any use of a zoning lot which was previously lawful but which does not conform to the applicable use regulations of the district in which it is located, either on the effective date of this chapter or as a result of any subsequent amendment thereto[.]" CZC § 21–1.10.

On October 22, 1986, the LUO was adopted and replaced the CZC. The general purpose of the LUO "is to regulate land *use* in a manner that will encourage orderly *development* in accordance with adopted land use policies[.]" LUO § 21A–1.20. Like the CZC, the LUO establishes zoning districts and designates such districts on zoning maps, LUO § 21–2.10; provides for the zoning maps to be prepared by the director and adopted by ordinance, LUO § 21–2.30; and consigns all parcels on the maps to zoning classifications. *Id.*

The LUO defines nonconforming use as "any *use* of a *structure* or a *zoning lot* which was previously lawful but which does not conform to the applicable use regulations of the district in which it is located, either on the effective date of this chapter or as a result of any subsequent amendment." LUO § 21–9.1.

In October 1986, Lot 56's district was rezoned under the LUO, this time from an R–6

6. The Coastal Zone Management Act, HRS ch. 205A (1993), provides that a permit must be obtained before development can occur in certain "special management areas" along the shoreline. HRS § 205A–28.

7. A "nonconforming use" has been defined by commentators as

[a] use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the zoning restrictions applicable to the district in which it is situated.... This definition, without significant change of its essential elements, is used by the courts, by commentators on municipal law, by writers in the narrower area of land-use controls, and by the draftsmen of municipal zoning legislation and state enabling statutes.

1 Kenneth H. Young, *Anderson's American Law of Zoning* § 6.01, at 481–82 (4th ed.1996) (footnotes omitted).

Nonconforming uses have been upheld by courts to avoid the harsh consequences of a change in zoning classification:

In upholding provisions which allowed existing uses to continue the courts [have] said that the distinction between existing and future uses was not arbitrary or unreasonable, had sound basis, and affected similarly, persons who were similarly situated. It was said that a municipality had a right to protect existing uses to avoid making an ordinance harsh and unnecessarily burdensome, and that absent such a provision the impact of a zoning ordinance would be manifestly unjust.

*Id.* § 6.05, at 491 (footnotes omitted).

Courts have also implied that the impact of rezoning on *existing* uses may involve *constitu-*tional considerations: "[A]n ordinance which prohibits an existing use will be sustained where the resulting loss to the owner is 'relatively slight and insubstantial,' but a substantial user has a vested right which enjoys constitutional protection against municipal zoning power." *Id.* § 6.06, at 495–96.

to an R–5 Residential (R–5) district.[8]

Sometime in 1987, Windward began using a twenty-fourpassenger minibus to transport persons to and from Lot 56. The minibus was used to carry guests of Windward, Inc.

Also in 1987, Windward constructed a pontoon boat capable of carrying thirty persons. This boat was used to accommodate guests of Windward, Inc.

In 1990, Windward constructed a pontoon boat capable of carrying fifty to sixty people. Again, this boat was used to accommodate guests of Windward, Inc.

Sometime thereafter, Windward constructed a third pontoon boat. This boat was not used to carry guests.

The minutes of the October 11, 1989 Kahalu‘u Neighborhood Board meeting reflected residents' concerns about the number of buses transporting tourists to the hotel area, possible oil spills and pollution in the canal by Windward's boats, and obstruction of the canal by the boats. Subsequently, on October 13, 1989, the Kahalu‘u Neighborhood Board filed a complaint with the Building Department about Windward's activities.

On July 10, 1991, Windward was cited by the Building Department for conducting a commercial aquatic business on Lot 56, in violation of LUO §§ 21A–3.120 and 5.40–2.[9]

LUO § 21A–3.120 which relates to nonconforming uses provides, in pertinent part:

Nonconforming Uses.

(1) A *nonconforming use* shall not extend to any part of the structure or lot which was not arranged or designed for such *use* at the time of adoption of the provisions of this chapter.

. . . .

(4) Any *nonconforming use* may be changed to another nonconforming use of the same nature and general impact, or to a more restricted *use*, provided

that the change to a more restricted use may be made only if the relation of the use to the surrounding property is such that adverse effects on occupants and neighboring properties will not be greater than if the original nonconforming use continued.

(Italics in original and emphasis added.)

Windward responded by letter to the Building Department contending, in part, that Lot 56 had been approved for nonconforming hotel use, and its "commercial boating activity existed prior to the adoption of the [LUO] and the [r]ezoning of the property from Hotel Resort to Residential."

Windward thereafter received a reply from the director, explaining that Windward's interpretation of the LUO was incorrect and that an "aquatic recreational business" was permitted only for bona fide guests of the hotel. The letter stated:

The violation involves the operation of an aquatic recreational business which buses visitors to your property at 47–039 Lihikai Drive, or other properties, so that they may engage in boating and related activities.

Your interpretation of the [LUO] is incorrect. The resort designation of your property is nonconforming and the activities in which you are engaged on this property are permitted only if they involve bona fide guests of the hotel on the property. You are not permitted to provide the same services to visitors who are not staying on the property.

Subsequently the director issued a September 20, 1991 order confirming that Windward was in violation of LUO §§ 21A–3.120 and 5.40–2.

The director's order required Windward to "cease and desist from the violation," to correct the violation, and to pay a civil penalty.

---

8. Upon the adoption of the Land Use Ordinance, Honolulu, Haw. Rev. Ordinances (LUO) in October 1986, the R–6 Residential (R–6) districts were eliminated and Lot 56 was accordingly rezoned from R–6 to R–5 Residential.

A residential designation evinces a purpose that the primary use of parcels in the district shall be for detached residences and the intent is

to provide areas for urban residential development. LUO § 21A–5.40 (Supp.1987). The purpose and intent of a residential designation has remained unchanged. LUO § 21–5.40 (Feb.1997 Rev.).

9. LUO § 21A–5.40–2 relates to the standards for districts zoned for residential use.

The violation was described as "[a]ccepting customers other than guests of the nonconforming hotel use for the accessory commercial aquatic activity on [Lot 56] zoned R–5, Residential District."

On October 21, 1991, Windward filed an appeal from the director's order to the ZBA.

On February 13, 1992, the ZBA heard Windward's appeal, unanimously affirmed the DLU's action, and denied the appeal.

On March 10, 1992, the director filed proposed findings of fact, conclusions of law, and a decision and order (the proposed order) with the ZBA. On that same day, a copy of the proposed order was also mailed to Windward's counsel. The ZBA scheduled the adoption of the proposed order for April 16, 1992. This consideration was continued to April 30, 1992,[10] and then because of a lack of a quorum, until May 14, 1992.

On May 14, 1992, Windward's counsel requested an extension of time to file objections to the proposed order. The ZBA denied the request as untimely under ZBA Rule 3.9(a).[11] The ZBA then adopted the director's proposed order as its own (the ZBA order).

Windward filed a motion to reconsider the adoption of the proposed order. This motion was denied.

On August 7, 1992, Windward filed a notice of appeal with the court. On June 14, 1993, the matter was heard and on July 2, 1993 the court issued its order affirming the ZBA's order. This appeal ensued.

## II.

The ZBA is the administrative agency designated to hear and determine appeals from the director's actions in the administration of the City and County of Honolulu zoning code. *Price v. Zoning Bd. of Appeals of the City and County of Honolulu,* 77 Hawai'i 168, 175, 883 P.2d 629, 636

(1994). Thus, the ZBA's order was an administrative decision subject to review by the circuit court. Hawai'i Revised Statutes (HRS) § 91–14(a). " '[On] an appeal from a circuit court's review of an administrative decision, the appellate court will utilize identical standards applied by the circuit court.' " *Price,* 77 Hawai'i at 171, 883 P.2d at 632 (quoting *Mauna Kea Power Co. v. Board of Land and Natural Resources,* 76 Hawai'i 259, 264, 874 P.2d 1084, 1089 (1994)). We examine Windward's appeal, then, in this context.

## III.

Initially we observe that it is unclear as to which date the parties believe sets the benchmark for determining Windward's nonconforming use, the 1984 rezoning from H–1 to R–6 under the CZC or the 1986 rezoning from R–6 to R–5 with the enactment of the LUO. In the hearing before the ZBA, Windward argued that its boating operation was in existence prior to the 1984 CZC rezoning. The director's position at the ZBA hearing was that "the sole issue ... [was whether Windward could] expand a nonconforming use that didn't exist when the [LUO] came into effect in 1986."

On appeal, Windward argues that if any change occurred in the use of Lot 56 after the "rezoning," the uses before and after the "rezoning" were of the same general impact. It is unclear which rezoning Windward is referring to although, given Windward's position at the ZBA hearing, it may be implied Windward refers to the 1984 CZC rezoning.

On appeal, the director and the ZBA appear to agree, maintaining that "it is clear from Schrader's own testimony that the expansion of the nonconforming use occurred after the property had been rezoned to residential use in March of 1984." But the director and the ZBA also contend that "[b]y

---

10. The record does not indicate why the April 16, 1992 ZBA meeting was continued.

11. The ZBA's Rule 3.9(a) provides:
 (a) The party prevailing in the appeal shall prepare a proposed Order for adoption by the [ZBA] which shall set forth in separately numbered paragraphs the findings of fact and con-
 clusions of law material to the decision of the [ZBA], and the decision. *Any party objecting to the proposed Order shall present such objections in writing to the [ZBA] no later than 15 days after receipt of the proposed Order.*
 (Emphasis added.)

Schrader's own admission the first pontoon boat would have been built in 1987, *after the enactment of the LUO*." (Emphasis added.) Since the director and the ZBA refer to both rezonings, it is unclear as to which they rely on to establish the extent of Windward's nonconforming use.

CZC § 21–1.7(b) appeared to relate nonconforming uses to geographical concepts. In pertinent part, CZC § 21–1.7 provided:

(b) Nonconforming uses of land.

(1) Enlargement or extension. No nonconforming[12] use of land shall be enlarged, increased or extended to *occupy a greater area of land than was occupied at the effective date of this chapter.*

(Emphasis added.)

By contrast, LUO § 21–3.120 appears to extend nonconforming use restrictions beyond geographical considerations to include considerations of the nature and impact of changes in the nonconforming use. *See* LUO § 21A–3.120 quoted *supra.*

We note that under a given set of circumstances, the application of the CZC on one hand or the LUO on the other, may become significant. We believe, however, that it is immaterial to this appeal whether the rezoning of Lot 56 from H–1 to R–6 under the CZC in 1984 or the rezoning of Lot 56 from R–6 to R–5 with the enactment of the LUO in 1986 establishes the parameters for Windward's nonconforming use. The ZBA's findings, which we do not find clearly erroneous, *see infra,* indicate that Windward's expansion and intensification of any nonconforming use occurred in 1987 and thereafter. Therefore, regardless of whether 1984 or 1986 is used as the benchmark to establish Windward's nonconforming use, we reach the same result.

## IV.

### A.

■ One of Windward's contentions is that the ZBA erred in rendering conclusion of law (conclusion) 4, which declared that "[Windward's] commercial marine activities[13] are not a primary or principal use of Lot 56 and are an accessory use to the nonconforming hotel."

■ Because we understand Windward's argument to rest on the CZC we follow the rule that "[c]onstruction of the provisions of the CZC is a matter of statutory interpretation, the correctness of which is freely reviewable by [the appellate] court[.]" *Foster Village Community Ass'n v. Hess,* 4 Haw.App. 463, 468, 667 P.2d 850, 853 (1983). We believe that conclusion 4 rests upon an interpretation of the zoning code and, therefore, we review it under the right/wrong standard. An agency's conclusions are freely reviewable by the courts under the right/wrong standard. *Price,* 77 Hawai'i at 171–72, 883 P.2d at 632–33.

### B.

■ Windward argues that if its marine activities are found to be a "principal use" for parcels zoned H–1 under the CZC, then Windward's activities would not be disallowed but would be in conformity with H–1 zoning. A principal use was not generally defined in the CZC. CZC § 21–1.10. However, the principal use for each type of zoning district was described in corresponding sections of the CZC.

Because Lot 56's district was zoned H–1 prior to R–6 rezoning on March 1, 1984, the principal uses denoted for the H–1 zoning classification in 1984 are relevant. In 1984 the principal uses for H–1 districts included

12. We believe that there was an error in the printing of the Revised Ordinances of Honolulu (ROH) (1983) in § 21–1.7(b)(1) where the word "conforming" was used instead of "nonconforming." Both the prior version of § 21–1.7(b)(1) and its successor § 21A–3.120(C)(1), reflect that the prohibitions applied to *non* conforming rather than conforming use.

CZC § 21–1.7(b)(1) (1978) provided:
Enlargement or extension. No *non* conforming use of land shall be enlarged, increased or extended to occupy a greater area of land than was occupied at the effective date of this chapter.
(Emphasis added.)

13. Although the ZBA referred to the cited activities as "commercial marine activities," the director referred to such activities as "commercial aquatic activity" in his September 20, 1991 notice of order. The terms apparently refer to the same activity.

the following: "(1) Hotels; (2) Parks, playgrounds and community centers, botanical and zoological gardens and other public buildings and uses; (3) Public utilities installations and substations; ... [and] (4) Time sharing." CZC § 21–7.2(a).

As set forth above, commercial marine activities were not enumerated in the CZC as a principal use of a district zoned H–1. Therefore, the ZBA's conclusion that Windward's marine activity was not a principal use of Lot 56 was correct.

■ .However, the CZC did allow for "accessory use," which was defined as:

(1) *[A] use which is conducted on the same zoning lot as the principal use to which it is related* (whether located within the same building or an accessory building or structure, or as an accessory use of land), or which is conducted on a contiguous lot (in the same ownership), and

(2) *Is clearly incidental* to, and customarily found in connection with such principal use, and

(3) *Is operated and maintained substantially for the benefit or convenience of* the owners, *occupants,* employees, *customers,* or visitors *of the zoning lot with the principal use.*

CZC § 21–1.10 (emphases added).

Windward's marine activities on Lot 56 were conducted in conformance with the definition of "accessory use" in the CZC because they were incidental to its H–1 zoning and there is no dispute that the marine activities were operated substantially for the benefit of Windward's hotel occupants and customers. Therefore, the ZBA's determination that Windward's marine activities were an accessory use to Lot 56 was also correct.

### V.

Windward also asserts that the ZBA erred in deciding in conclusions 5, 6, and 7 that Windward had violated LUO § 21A–3.120 when it employed the twenty-four-passenger minibus and three pontoon boats to accommodate customers other than bona fide guests [14] of Windward, Inc. Conclusions 5, 6, and 7 stated:

5. [Windward] ha[s] expanded and increased [its] nonconforming hotel use by the addition of a 24–passenger minivan in violation of [LUO § 21A-] 3.120.

6. [Windward] ha[s] expanded and increased [its] nonconforming hotel use by the addition of three pontoon boats in violation of [LUO § 21A-] 3.120.

7. [Windward] ha[s] expanded and increased [its] nonconforming hotel use by accepting customers other than bona fide hotel guests for [Windward's] commercial marine activities in violation of [LUO § 21A-] 3.120.

In connection with these conclusions, Windward additionally urges that the ZBA exceeded its authority by ordering Windward to cease and desist from using the minibus and pontoon boats for both bona fide guests of Windward, Inc. and for customers who participated in Windward's marine activities.

The ZBA's order announced the following:

IT IS HEREBY FURTHER ORDERED that [Windward] *shall cease and desist and shall discontinue the use of the 24–passenger minibus and the three pontoon boats for either the operations of the hotel* and/or the commercial marine activities; and

IT IS HEREBY FURTHER ORDERED that [Windward] shall cease and desist and discontinue the acceptance of customers other than guests actually residing or renting rooms at the hotel for the commercial marine activities.

(Emphasis added.) We need not reach the question of whether the ZBA erred with respect to conclusions 5 and 6 because we agree the ZBA's order was improper as to the matters encompassed in conclusions 5 and 6.

---

**14.** In his testimony before the ZBA, Schrader related that guests who were not residing at the hotel would be registered as guests of the hotel and charged a fee for transportation and use of the hotel's facilities. To avoid confusion as to the status of persons engaging in aquatic activities who did not reside at the hotel and those who did, we adopt the ZBA's characterization of persons who resided at the hotel as "bona fide" hotel guests.

## A.

■ The DLU maintains that the ZBA's decision and order "merely carried out the intent of the directors's order with respect to the increase and expansion of [Windward's] nonconforming use." However, the director's order was limited to Windward's "*acceptance of customers other than [bona fide] guests* of the nonconforming hotel use for the accessory commercial aquatic activity." (Emphasis added.) Therefore, it is evident that the ZBA went beyond the parameters of the director's order by further ordering Windward to cease and desist from altogether using its minibus and pontoon boats.[15]

Revised Charter § 6–909 grants the ZBA authority to hear appeals from the actions of the director.[16] Pursuant to that section, the ZBA "shall hear and determine appeals from the actions of [the director] in the administration of the zoning code and subdivision ordinances and any rules and regulations adopted pursuant thereto." Section 6–909 also mandates that the ZBA "shall ... sustain[ ] [an appeal] only if the board finds that the director's action was based on an erroneous finding of a material fact, or that the director had acted in an arbitrary or capricious manner or had manifestly abused [his or her] discretion." *See also* Rule 3.8 of the Rules Relating to Administrative Procedure, Zoning Board of Appeals, City and County of Honolulu.

As we have intimated, the director has legal authority to issue cease and desist orders. LUO § 21–8.6–2. LUO § 21–8.6–2 provides, in pertinent part:

[I]f the director determines that any person is violating any provision of this chap-

ter, any rule adopted thereunder or any permit issued thereto, *the director may have the person served ... with a notice and order pursuant to this section.*

. . . .

(b) Contents of Order.

(1) *The order may require the person to* do any of the following:

(A) *Cease and desist from the violation;*

. . . .

(2) The order shall advise the person that the order shall become final 30 days after the date of its mailing or delivery. The order shall also advise that the director's action may be appealed to the [ZBA].

(c) Effect of Order—Right to Appeal. . . . *The person may appeal the order to the [ZBA] as provided in [Revised Charter § ]6–909.*

(Emphases added.)

■ In interpreting the Revised Charter and ordinances we must ascertain and give effect to the intent of the drafters. *Maui County Council v. Thompson,* 84 Hawai'i 105, 106, 929 P.2d 1355, 1356 (1996), *reconsideration denied,* 84 Hawai'i 496, 936 P.2d 191 (1997) ("The interpretation of [a] charter is similar to the interpretation of a statute. And ... 'our foremost obligation is to ascertain and give effect to the intention of the legislature[,] which is to be obtained primarily from the language contained in the statute itself.' ") (quoting *State v. Baron,* 80 Hawai'i 107, 113, 905 P.2d 613, 619, *reconsideration granted in part and denied in part,* 80 Hawai'i 187, 907 P.2d 773 (1995)); *State v. Lum,* 8 Haw.App. 406, 410, 807 P.2d 40, 43, *recon-*

---

**15.** We are aware of the inconsistency between the director's narrowly drawn cease and desist order issued to Appellants–Appellants Windward Marine Resort, Inc., North Bay Boat Club, Inc., and Schrader and the director's proposed order which was adopted by the ZBA as its own. Despite the fact that both orders were prepared by or on behalf of the director, the boundaries we set on these orders rest on the jurisdiction of the bodies issuing them.

**16.** As completely set forth, Section 609 of the Revised Charter of the City and County of Honolulu 1973, as amended, provides:

Zoning Board of Appeals—

There shall be a [ZBA] which shall consist of five members. The [ZBA] shall be governed by the provisions of Section 13–103 of this charter. The [ZBA] shall hear and determine appeals from the actions of [the director] in the administration of the zoning code and subdivision ordinances and any rules and regulations adopted pursuant thereto. An appeal shall be sustained only if the [ZBA] finds that the director's action was based on an erroneous finding of a material fact, or that the director had acted in an arbitrary or capricious manner or had manifestly abused [his or her] discretion.

*sideration denied,* 8 Haw.App. 661, 868 P.2d 466, *cert. denied,* 72 Haw. 619, 841 P.2d 1075 (1991) (The drafters' "intent should be determined, if possible, from the language of the ordinance, and the language must be read in the context of the entire ordinance and construed in a manner consistent with the purposes of the ordinance."); *see also Foster Village,* 4 Haw.App. at 469, 667 P.2d at 854 ("Courts apply the same rules of construction to municipal ordinances as they do to statutes[.]"). From an examination of the language of Revised Charter § 6–909 and of LUO § 21–8.6–2, it is plain that the director is empowered to issue cease and desist orders, and the ZBA is limited to hearing and determining appeals from such orders.

Because there is no express provision in the Revised Charter granting the ZBA the power to issue cease and desist orders, its jurisdiction is confined to hearing appeals from the director's orders. With respect to such appeals, the ZBA may only sustain an appeal if it finds that the director's action was faulty under the three standards set forth in Revised Charter § 6–909. By implication, then, the ZBA must deny all other appeals, thereby leaving the respective orders of the director intact. *Id.*

Here, the ZBA's order did not merely deny Windward's appeal. Rather, the terms of the ZBA's order usurped the director's jurisdiction by ordering Windward to cease and desist entirely from using the minibus and the three pontoon boats.[17] In doing so, the ZBA also broadly extended the prohibition on the minibus and boat use to bona fide hotel guests who were not covered under the director's order.

### B.

Judicial review of contested cases [18] before administrative agencies is governed by HRS § 91–14 (1993).

HRS § 91–14(g) provides, in part:

**Judicial review in contested cases.**

. . . .

17. *See supra* n. 16 and accompanying text.

18. A contested case is defined by the Hawai'i Administrative Procedure Act, HRS ch. 91, as "a proceeding in which the legal rights, duties, or

(g) *Upon review of the record the [circuit] court* may affirm the decision of the agency or remand the case with instructions for further proceedings; or it *may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative* findings, conclusions, decisions, or *orders are:*

. . . .

(2) *In excess of the statutory authority or jurisdiction of the agency[.]*

(Emphases added.)

As we have pointed out, the issuance of cease and desist orders was in excess of the ZBA's legal authority as conferred on it by Revised Charter § 6–909.

We also believe that that part of the ZBA's order broadly banning Windward from using its minibus and pontoon boats exceeded the director's order to cease and desist "accepting customers other than guests of the nonconforming hotel use for the accessory commercial aquatic activity."

 However, we concur that insofar as the ZBA prohibited Windward from accepting customers other than the guests actually residing or renting rooms at the hotel for its commercial marine activities, it did, in effect, affirm the director's order. This part of the ZBA's order, while improperly ordering Windward to "cease and desist," did no more than what the director had ordered. We regard this aspect of the ZBA order as supported by the record as we relate *infra* in discussing two of Windward's other points on appeal.

### C.

### 1.

 As noted above, Windward contends the ZBA erred as to conclusion 7. In conclusion 7 the ZBA determined that Windward had increased its nonconforming hotel use by accepting customers other than bona

privileges of specific parties are required by law to be determined after an opportunity for agency hearing." HRS § 91–1(5).

fide guests for Windward's commercial marine activities. We believe conclusion 7 presents a mixed question of fact and law and thus must be reviewed under the clearly erroneous standard. A mixed question of fact and law is reviewed under the clearly erroneous standard because such a conclusion is contingent upon the facts and circumstances of the specific case. *Price,* 77 Hawai'i at 172, 883 P.2d at 633 (citing *AIG Ins. Co. v. Estate of Caraang,* 74 Haw. 620, 629, 851 P.2d 321, 326 (1993); *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 29, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992)). In our view, the ZBA's conclusion was not clearly erroneous.

Albert Gabuat (Gabuat) was one of the witnesses at the ZBA hearing. Gabuat lived on Lihikai Drive, next to Lot 56, for a period of about seven or eight years prior to the ZBA hearing. He reported that from approximately 1988 until the time of the hearing "it started getting real full blown commercial [sic] in that area, [with Windward] bringing in people by buses." Gabuat further testified that the passenger capacity of Windward's boats had increased, that the canal water had once been "clear" but was now discolored, and that buses were apparently bringing tourists in from Waikiki six days a week.

Henry Schwenker (Schwenker), who had been "house-sitting" a residence on Lihikai Drive, testified that persons who did not appear to be guests of Windward's hotel were bussed in to use the pontoon boats. He additionally complained about changes in the canal brought about by the frequent use of the pontoon boats.

Schrader testified that he was unsure of when such activity began but believed it started somewhere around 1980 or 1982. This time period preceded both the 1984 rezoning from H–1 to R–6 under the CZC and the 1986 rezoning from R–6 to R–5 under the LUO. Thus, such activity would be considered part of the nonconforming H–1 use of Lot 56 which existed prior to the LUO's effective date in 1986. Schrader also asserted that the bussing of tourists was a "minor deal" in the context of Windward's marine activities.

■ The evidence on this point was disputed. Under the clearly erroneous standard we "will not disturb [the agency's determination] unless, after examining the record, [we are] left with a 'definite and firm conviction that a mistake had been committed.'" *Price,* 77 Hawai'i at 172,. 883 P.2d at 633 (quoting *State v. Furutani,* 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994)). In light of Gabuat's and Schwenker's testimony we are not left with a definite and firm conviction that a mistake was made by the ZBA.

Hence, we cannot agree that the ZBA's conclusion that Windward violated LUO § 21A–3.120 by accepting customers other than bona fide guests of Windward, Inc. was clearly erroneous. Based on the evidence it received, the ZBA could determine that the marine activities for customers other than bona fide guests had resulted in a change in the nature and general impact of Windward's nonconforming hotel use from that which existed prior to the adoption of the LUO in 1986 and as a result, Windward had violated LUO § 21A–3.120.

2.

■ In conjunction with conclusion 7, Windward also challenges finding 23 and finding 33. An agency's findings are also reviewed under the clearly erroneous standard. *Price,* 77 Hawai'i at 172, 883 P.2d at 633. Applying that standard, we are not left with a definite and firm conviction that the ZBA made a mistake as to findings 23 and 33.

■ Finding 23 stated, "On occasion, [Windward] ha[s] utilized large tour buses to bring in tourists to partake in the commercial aquatic activities offered by [Windward]." Finding 23 is not clearly erroneous and is supported by Schrader's own testimony. At the ZBA hearing Schrader testified that:

On occasion we've had a Roberts [bus] come up to the corner of the Kam Highway . . . and we have picked [tourists] up. But every once in a while we get a fair size trip like . . . we had one of the vans from the Hula Bowl and as part of their visit to

[Hawai'i] we gave them a day on the bay. So in that case we had 40 people. So we brought them in on a bus.

Finding 33 is also not clearly erroneous. It stated, "[Windward] ha[s] not introduced any evidence, other than the oral testimony of [Windward's] principal, [Schrader], to substantiate [Windward's] claim of providing commercial aquatic activities to persons who were not residing or staying as guests of [Windward, Inc.] prior to the change to residential zoning in 1984."

Gabuat testified that the bussing of customers for marine activities had only occurred within four years of the 1992 ZBA hearing. Although Windward concedes that the only evidence introduced to support its claim that activities had increased prior to 1984 was Schrader's testimony, Windward claims that the DLU did not produce any evidence to contradict Schrader and, therefore, finding 33 was clearly erroneous. Schrader's testimony, however, was contradicted by Gabuat and Schwenker. Moreover, in deference to the ZBA's fact finding function, we decline to weigh the evidence and pass on issues of witness credibility and conflicting testimony. *Application of Hawaiian Elec. Co.*, 81 Hawai'i, 459, 465, 918 P.2d 561, 567 (1996).

We conclude, then, that findings 23 and 33 were not clearly erroneous and were supported by the evidence. Under our disposition of this case we need not reach the other points raised in Windward's appeal.

### VI.

Therefore, we vacate the court's July 2, 1993 order in part, affirm the order in part, and remand with instructions to the court. On remand, we instruct the court to modify the May 14, 1992 order of the ZBA by striking those parts of the order which mandate Windward to "cease and desist" the use of the twenty-four-passenger minibus and the three pontoon boats. We affirm the court's order insofar as it sustains that part of the ZBA's order reiterating the director's order that Windward "discontinue the acceptance of customers other than guests actually re-

siding or renting rooms at the hotel for commercial marine activities."