174 P.3d 349

**COLONY SURF, LTD.,**
Plaintiff/Appellant–
Appellee,

v.

**DIRECTOR OF the DEPARTMENT OF PLANNING AND PERMITTING; Michel's Inc. and D.G. Anderson, Defendants/Appellees–Appellants,**

v.

**Zoning Board of Appeals,**
Defendant/Appellee–
Appellee.

No. 26037.

Supreme Court of Hawai'i.

Dec. 26, 2007.

David K. Tanoue, Deputy Corporation Counsel, for Defendant/Appellee–Appellant.

Director of the Department of Planning and Permitting and Donna Y.L. Leong, and Kaiulani E.S. Kidani of Cades Schutte LLP, for Defendants/Appellees–Appellants Michel's Inc. and D.G. Anderson.

Bruce L. Lamon of Goodsill Anderson Quinn & Stiffel, for Plaintiff/Appellant–Appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by NAKAYAMA, J.

Defendants/Appellees–Appellants, director of the Department of Planning and Permitting, State of Hawai'i, Michel's Inc., and D.G. Anderson (collectively referred to as "Appellants"), appeal from the first circuit court's[1] July 23, 2003 judgment on appeal in favor of Plaintiff/Appellant–Appellee, Colony Surf, Ltd. ("CSL"). Appellants assert the following points of error on appeal: (1) the circuit court erred by ruling that the daytime opera-

tion of Michel's "constitute[d] an 'expanded' nonconforming use" under section 21–4.110(c)(1) of the Land Use Ordinance, codified as Revised Ordinances of Honolulu ("ROH") § 21–4.110(c)(1);[2] (2) the circuit court erred by ruling that the daytime operation of Michel's following its temporary cessation constituted an "action" within the meaning of ROH § 21–4.110(c)(5),[3] inasmuch as it did not intend to reduce its hours; (3) the circuit court erred by construing ROH §§ 21–4.110(c)(2),[4] (c)(3),[5] and (c)(5) in pari materia and by ruling that the daytime operation of Michel's violated ROH § 21–4.110(c)(5); and (4) the circuit court erred by ruling that the daytime operation of Michel's increased its hours of operation within the meaning of ROH § 21–4.110(c)(1).

Based upon the following analysis, we reverse the circuit court's July 23, 2003 judgment.

## I. BACKGROUND

CSL is the owner of Colony Surf, a residential apartment building located at 2895 Kalākaua Avenue, Honolulu, Hawai'i. Colony Surf was originally constructed in 1959 and included a ground-floor restaurant as an accessory use.

In 1961, CSL subleased the restaurant space to Colony Surf Development Corpora-

---

1. The Honorable Eden Elizabeth Hifo presided.

2. ROH § 21–4.110(c)(1) states in pertinent part, "A nonconforming use shall not extend to any part of the structure or lot which was not arranged or designed for such use at the time of adoption of the provisions of this chapter or subsequent amendment; nor shall the nonconforming use be expanded in any manner, or the hours of operation increased."

3. ROH § 21–4.110(c)(5) provides, "Any action taken by an owner, lessee, or authorized operator which reduces the negative effects associated with the operation of a nonconforming use-such as, but not limited to, reducing hours of operation or exterior lighting intensity-shall not be reversed."

4. ROH § 21–4.110(c)(2) states, in pertinent part:
 Any nonconforming use that is discontinued for any reason for [twelve] consecutive months, or for [eighteen] months during any three-year period, shall not be resumed; however, a temporary cessation of the nonconforming use for

purposes of ordinary repairs for a period not exceeding 120 days during any [twelve]-month period shall not be considered a discontinuation.

5. ROH § 21–4.110(c)(3) provides, in pertinent part:
 Work may be done on any structure devoted in whole or in part to any nonconforming use, provided that work on the nonconforming use portion shall be limited to ordinary repairs. For purposes of this subsection, ordinary repairs shall only be construed to include the following:
 . . .;
 (B) May include work required to comply with federal mandates such as, but not limited to, the Americans with Disabilities Act (ADA) or the National Environmental Protection Act (NEPA); or
 (C) May include interior and exterior alterations, provided that there is no physical expansion of the nonconforming use or intensification of the use

tion for the purpose of operating Michel's Restaurant ("Michel's"). At that time, Michel's operated 365 days per year, from 6:30 a.m. to 2:00 a.m.

In 1982, the area was rezoned A–2, which rendered the accessory restaurant use nonconforming.

In October 1995, Michel's was temporarily closed as a result of a mortgage foreclosure. D.G. Anderson ("Anderson") emerged as the successful bidder at the ensuing foreclosure sale, held in January 1996. Immediately after purchasing the lease, Anderson sought to renovate Michel's in two phases.

Upon completion of the first phase of interior renovations in August 1996, Michel's reopened, mainly operating from 4:30 p.m. to about 2:00 a.m. and offering Sunday brunch daytime services "for about a month." From August 1996 until January 1998, limited daytime operation of Michel's consisted of: (a) a regular Sunday brunch from December 29, 1996 until June 15, 1997; (b) three lunch functions held on August 22, 1996, November 22, 1996, and December 7, 1997; and (c) one breakfast function held on July 12, 1997. In January 1998, Michel's began its daytime operations from 7:00 a.m. to 4:30 p.m. to accommodate private functions, including weddings, on a periodic basis.

After Colony Surf consented to ADA access compliance improvements on September 23, 1998, Anderson commenced construction of this second phase of renovations. Once the second phase renovations were completed in October 1998, Michel's entered into a $650,000 contract with Wedding Emporium to host wedding services and receptions in-

side of its restaurant. Michel's opened its dining room to regularly [6] host wedding ceremonies from 9:00 a.m. to 5:00 p.m. and receptions from 10:00 a.m. to 10:00 p.m.[7]

The daytime wedding emporium use of Michel's resulted in "noise, traffic and congestion" in the residential neighborhood "which severely and negatively affect[ed] the neighborhood quality of life." [8] On December 3, 1998, CSL sent a letter to the director of the Department of Planning and Permitting, State of Hawai'i ("director") challenging Michel's *use* of the premises for weddings, receptions, and other private functions. By letter dated February 17, 1999, the director rejected CSL's challenge, informing it that such uses were subsumed within the scope of restaurant uses.

In a January 19, 2001 letter to the director, CSL questioned Michel's *hours of operation* under ROH §§ 21–4.110(c)(1) and (5). By letter dated January 2, 2002, the director concluded that "the daytime operation of [Michel's] nonconforming use (an eating establishment with an accessory wedding chapel) is not in conflict with [ROH §§ ]21–4.110(c)(1) and/or (5)."

## B. Procedural History

### 1. *Director declared that Michel's did not increase its operating hours*

On March 1, 2002, CSL filed a petition for a Declaratory Ruling with the director alleging that Michel's reduced its hours of operation and subsequently "reversed the reduction in hours and began opening at about

6. The frequency of wedding receptions at Michel's ranged from three per day to none during a week.

7. The restaurant was not open to the public during daytime hours but was available to the public for dinner and private dinner parties.

8. CSL complained that the wedding emporium is incompatible with the residential character of the neighborhood:

Colony Surf has zero parking stalls for Michel's—zero, none, not one. There is not even a loading zone for delivery trucks. Larger trucks can't even turn around on the property.

Trucks making food deliveries to Michel's must use the neighbor's property or back out a two-hundred-foot long, twenty-food wide driveway to Kalakaua Avenue. The trucks backing up fills the residential neighborhood with the incessant beep-beep-beep of their reversing signals. Now add to that problem a series of thirty-foot long limousines arriving at the same time (morning hours), each with a bride and groom, an entourage of wedding attendants, photographers, and a driver. None of these wedding parties arrives in a taxi! There is no place to park the limousine so it sits clogging the driveway. The limousines can't turn around, so they too must back out (or use the neighbor's property).

9:00 a.m. for wedding functions" in violation of ROH §§ 21–4.110(c)(1) and (5).

The director concluded that:

there was no action taken by the new owner of Michel's to reduce the impact of the nonconforming eating establishment when daytime services were not fully restored upon assuming ownership. And, therefore, there was no increase in operating hours once the owner was finally able to resume full daytime services after renovations were completed.

### 2. *Zoning Board of Appeals affirmed the director's ruling*

On May 28, 2002, CSL appealed the director's ruling to the Zoning Board of Appeals ("ZBA"). CSL argued that Michel's violated ROH §§ 21–4.110(1), (2), and (5), inasmuch as: (1) its wedding operations constituted an expanded type of nonconforming use, (2) it resumed its daytime operation, and (3) it increased its operating hours of the nonconforming use. In its "Findings of Fact, Conclusions of Law, and Decision, and Order on Petitioner Appealing From Director's Declaratory Ruling No. 2002/DEC–1," filed January 10, 2003, the ZBA affirmed the director's decision.

### 3. *Circuit court reversed the ZBA's decision*

On February 7, 2003, CSL filed a notice of appeal in the circuit court. On July 23, 2003, the circuit court filed a judgment on appeal reversing the decision of the ZBA.

In its findings of fact and conclusions of law, the circuit court found and concluded in pertinent part:

### I. FINDINGS OF FACT

. . . .

6. CSL is a "person aggrieved" by the ZBA Decision within the meaning of Hawaii Revised Statutes ("HRS") 91–14(g).

7. The Court hereby incorporates by reference the Findings of Fact set forth in the Director's Ruling and the ZBA Decision.

8. *The operation of Michel's prior to 4:30 p.m. and after 2:00 a.m. ("daytime operation") constitutes an "expanded"* nonconforming use of Michel's within the meaning of [ROH] [§ ][21–]4[.]110(c)(1).

9. *The daytime operation of Michel's "increased" its "hours of operation" within the meaning of [ROH] [§ ][21–]4[.]110(c)(1).*

10. *Anderson's daytime operation of Michel's was an "action" by Anderson which reversed a reduction in "the negative effects" associated with the operation of Michel's within the meaning of [ROH] [§ ][21–]4[.]110(c)(5).*

## II. CONCLUSIONS OF LAW

. . . .

4. In determining whether the daytime operation of Michel's violates the [ROH], "strict limits are placed upon nonconforming uses to discourage the perpetuation of these uses, and thus facilitate the timely conversion to conforming uses." [ROH] [§ ]21–4.110(c).

5. A nonconforming use shall not be expanded in any manner. [ROH] [§ ]21–4.110(c)(1).

6. The hours of operation of a nonconforming use shall not be increased. [ROH] [§ ]21–110(c)(1).

7. *The daytime operation of Michel's violates [ROH] [§ ]21–4.110(c)(1).*

8. The contrary conclusions set forth in the Director's Ruling and the ZBA Decision are in "violation of constitutional or statutory provisions" within the meaning of HRS 91–14(g)(1).

9. The term "use" in [ROH] [§ ]21–4110(c)(2) [sic] refers to the nonconforming use in the entirety, as opposed to daytime use.

10. The daytime use of Michel's does not violate [ROH] [§ ]21–4110(c)(2) [sic].

11. Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another. *Kam v. Noh,* [70 Haw. 321,] 770 P.2d 414 (Haw. 1989).

12. The subsections of [ROH] Sec. 21–4.110(c) are in pari materia. *Kam v. Noh,* [70 Haw. 321,] 770 P.2d 414 (Haw.1989).

13. *Construing [ROH] Sec. 21–4.110(c)(5) in pari materia with [ROH] [§ ]1–4.110(c)(2), and in particular with the time limits for cessation of a nonconforming use due to ordinary repairs such as work to comply with the Americans with Disabilities Act included in [ROH § 21–4.110](c)(2) by way of [ROH § ]21–4.110(c)(3), the daytime operation of Michel's violates [ROH] [§ ]21–4.110(c)(5).*

14. The contrary conclusions set forth in the Director's Ruling and the ZBA Decision are in "violation of constitutional or statutory provisions" within the meaning of HRS [§ ]91–14(g)(1).

(Emphases added.)

On August 22, 2003, Appellants filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

### A. Secondary Appeal

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) (1993) to the agency's decision.

*Citizens Against Reckless Dev. v. Zoning Bd. of Appeals of City and County of Honolulu,* 114 Hawai'i 184, 193, 159 P.3d 143, 153 (2007) (citing *Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998)).

HRS § 91–14, "Judicial review of contested cases," provides in pertinent part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

### B. Interpretation of Administrative Rules

 When interpreting municipal ordinances, we apply the same rules of construction that we apply to statutes. While an administrative agency's interpretation of the ordinance that it is responsible for implementing is normally accorded great weight, no deference is required when the agency's interpretation conflicts with or contradicts the manifest purpose of the ordinance it seeks to implement.

*City and County of Honolulu v. Hsiung,* 109 Hawai'i 159, 172, 124 P.3d 434, 447 (2005).

## III. DISCUSSION

### A. The Issue That the Daytime Operation of Michel's Constitutes an "Expanded" Nonconforming Use Under ROH § 21–4.110(c)(1) Was Not Properly Before the Circuit Court

Appellants' first point of error asserts that the circuit court erred by ruling that the "operation of Michel's prior to 4:30 p.m. and after 2:00 a.m. ('daytime operation') constitutes an 'expanded' nonconforming use of Michel's within the meaning of [ROH § ]21–4.110(c)(1)." Although framed as a challenge on the merits, Appellants actually argue that the circuit court "exceeded its jurisdiction in ruling that the daytime operation of Michel's" "expanded" the nonconforming use, insofar as CSL "challenged the daytime hours of operation under [ROH] §§ 21–4.110(c)(1) and (5), and not the use of Michel's for wedding functions" in its petition to the director. Thus, according to Appellants, the director and the ZBA did not rule on the issue, and it was therefore not a matter properly before the circuit court.

Although CSL petitioned the director regarding the "daytime operation" of Michel's violating ROH § 21–4.110(c)(1), it did not contend that Michel's expanded the *type of nonconforming use*, but merely argued that the increase in *operating hours* of Michel's violated ROH § 21–4.110(c)(1).[9] CSL presented case law and legal arguments in support of its sole position that "Michel's is a nonconforming use, which reduced its hours of operation and then reversed the reduction and *expanded its hours of operation* in violation of [ROH §§ 21–4.110(c)(1) and (5)]." (Emphasis added.) Thus, the director properly limited his review of the petition to whether Michel's was precluded from *increasing its hours of operation* pursuant to ROH §§ 21–4.110(c)(1) and (5).

Because the director ruled that Michel's did not increase its hours of operation in violation of ROH § 21–4.110(c)(1), the ZBA's ruling regarding whether Michel's complied with ROH § 21–4.110(c)(1) was limited to this matter. *See* Revised Charter of Honolulu § 6–1516 (2001) (providing that the ZBA shall "hear and determine appeals from the actions of the director"). Inasmuch as the ZBA did not rule on whether the type of daytime operation itself (a wedding business) constituted an "expansion" of the nonconforming use, the matter was not properly before the circuit court, and the circuit court's finding that the daytime operation violates ROH § 21–4.110(c)(1) should be reversed. *See HOH Corp. v. Motor Vehicle Indus. Licensing Bd., Dep't of Commerce & Consumer Affairs*, 69 Haw. 135, 141, 736 P.2d 1271, 1275 (1987) ("[J]udicial review of an agency determination must be 'confined to issues properly raised in the record of the administrative proceedings below.' "); *Aetna Life Ins. Co. v. Park*, 5 Haw.App. 115, 119, 678 P.2d 1101, 1104 (1984) ("It is explicit in the provisions of HRS § 91–14, and in the case law interpreting those provisions, that a review of the Commissioner's decision is confined to the issues properly raised in the record of the proceedings leading up to that decision.").

**B. Anderson Did Not Take An "Action" That Reduced the Negative Effects of the Nonconforming Use Pursuant to ROH §§ 21–4.110(c)(2), (3) and (5), Inasmuch As The Nineteen Month Cessation of Daytime Operation Was Within the Permissible Discontinuation of the Nonconforming Use, and Therefore, He Is Not Precluded From Resuming the Daytime Operating Hours of Michel's Under ROH § 21–4.110(c)(5)**

In their second point of error, Appellants argue that the circuit court erred by (1) ruling that the resumption of the daytime nonconforming use following its temporary cessation for nineteen months constituted an "action ... which reduces the negative effects associated with the nonconforming use" within the meaning of ROH § 21–4.110(c)(5); (2) construing ROH § 21–4.110(c)(5) *in pari materia* with ROH §§ 21–4.110(c)(2) and (3); and (3) concluding that ROH § 21–4.110(c)(5) precludes renewal of the daytime operation of Michel's, inasmuch as the owner of Michel's did not intend to reduce the hours of Michel's, and therefore, could not have later increased the negative effects of the daytime nonconforming use.

1. *"Action" under ROH § 21–4.110(c)(5) does not require the intent to permanently reduce the negative effects of the nonconforming use*

ROH § 21–4.110(c)(5) provides, "Any action taken by an owner, lessee, or authorized operator which reduces the negative effects associated with the operation of a nonconforming use—such as, but not limited to, reducing hours of operation or exterior lighting intensity—shall not be reversed." In determining whether "action" under ROH § 21–4.110(c)(5) requires the intent to permanently reduce the negative effects of the nonconforming use, we are guided by established principles of statutory interpretation.

---

9. CSL explained that the petition followed the director's determination that "the *daytime operation* of the ... nonconforming use (an eating establishment with an accessory wedding chapel) is not in conflict with [ROH § ]21–4.110(c)(1) and/or (5)," but did not reassert that the daytime operation conflicts with ROH § 21–4.110(c)(1) in the petition itself.

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

. . . .

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) (1993).

*Gray v. Admin. Dir. of the Court,* 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (some citations omitted). "Furthermore, the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." *Id.* (relying on HRS § 1–15(3) (1993) ("Every construction which leads to an absurdity shall be rejected.")).

■ Clearly, the "action ... which reduces the negative effects associated with the operation of a nonconforming use" must be "voluntary" or "intentional" in order to preclude the owner, lessee, or authorized operator from later increasing the negative effects. ROH § 21–4.110(c)(5). *See Black's Law Dictionary* 26, 1605 (8th ed.2004) (defining "act" as "[s]omething done or performed, [especially] voluntarily," and "voluntary" as "done by design or intention"). However, the Appellants' interpretation that the ordinance requires a voluntary "action" as well as an *action with the intention of permanently reducing* the negative effects is an additional element that is not supported by the ordinance's plain language. Under a strict interpretation of ROH § 21–4.110(c)(5), once an "action ... which reduces the negative effects associated with the operation of a nonconforming use" is taken, the action may not be reversed. *See Waikiki Marketplace Inv.*

*Co. v. Chair of Zoning Bd. of Appeals,* 86 Hawai'i 343, 354, 949 P.2d 183, 194 (App. 1997) ("[Z]oning laws and ordinances are strictly construed, 'as they are in derogation of the common law, and their provisions may not be extended by implication.' " (citing *Foster Village Community Ass'n v. Hess,* 4 Haw. App. 463, 469, 667 P.2d 850, 854 (1983))).

2. *Under the in pari materia doctrine, ROH §§ 21–4.110(c)(2) and (3) clarify ROH § 21–4.110(c)(5)*

■ However, inasmuch as "we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose," the construction of ROH § 21–4.110(c)(5) is not complete. *Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (citation and emphasis omitted). ROH §§ 21–4.110(c)(2), (3), and (5) relate to the subject matter of nonconforming uses. ROH § 21–4.110(c)(2) permits the cessation of a nonconforming use based on the purpose and period of time of the discontinued use, as follows:

Any nonconforming use that is discontinued for any reason for [twelve] consecutive months, or for [eighteen] months during any three-year period, shall not be resumed; however, a temporary cessation of the nonconforming use for purposes of ordinary repairs for a period not exceeding 120 days during any [twelve]-month period shall not be considered a discontinuation.

ROH § 21–4.110(c)(3) permits "ordinary repairs," including "interior and exterior alterations," to be done on any structure with a nonconforming use so long as the nonconforming use is not expanded. As construed above, ROH § 21–4.110(c)(5) prohibits an "action ... which reduces the negative effects associated with the operation of a nonconforming use" from being reversed. As this court has stated, however, "where the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored." *Enoka v. AIG Hawai'i Ins. Co., Inc.,* 109 Hawai'i 537, 560, 128 P.3d 850, 873 (2006) (quoting *Richardson v. City & County of Honolulu,* 76 Hawai'i 46, 54–55, 868 P.2d 1193, 1201–02 (1994) (brackets omitted)).

Therefore, in order to apply ROH §§ 21–4.110(2)(3), and (5), these subsections must be construed *in pari materia,* inasmuch as they pertain to the same purpose and subject matter. Appellants argue that the circuit court erred by construing ROH §§ 21–4.110(c)(2), (3), and (5) *in pari materia* because it invoked this doctrine *sua sponte* and these subsections pertain to different purposes [10] and were enacted at different times. HRS § 1–16 (1993) ("Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other.").

However, these subsections have the same purpose: "Strict limits are placed on nonconforming uses to discourage the perpetuation of these uses, and thus facilitate the timely conversion to conforming uses." ROH § 21–4.110(c). Moreover, Appellants admit that ROH §§ 21–4.110(c)(2) and (5) relate to the same subject matter, which is exactly what *requires* a court to invoke the *in pari materia* doctrine. HRS § 1–16. Accordingly, ROH §§ 21–4.110(c)(2), (3), and (5) *must* be construed in reference to each other, and the circuit court did not err by doing so.

Under the *in pari materia* doctrine, ROH §§ 21–4.110(c)(2) and (3) clarify ROH § 21–4.110(c)(5), which does not specify any period of time or manner in which the recommencement of the nonconforming use is permissible. ROH § 21–4.110(c)(2), which protects the temporary cessation of nonconforming use, explains which of ROH § 21–4.110(c)(5) "actions ... which reduce the negative effects associated with the operation of a nonconforming use" may be taken without jeopardizing the right to resume the operation of the nonconforming use. Further, ROH § 21–4.110(c)(3) provides that work on a nonconforming use may be performed for "purposes of "ordinary repairs," which includes "work required to comply with federal mandates such as, but not limited to, the [ADA]," and interior and exterior alterations that do not physically expand the "nonconforming use or intensification of use." ROH §§ 21–4110(c)(3) and (5).

Hence, a nonconforming use may be temporarily discontinued (and thereby is an "action" which reduces the negative effects) for (1) less than twelve consecutive months for any purpose plus 120 days for ordinary repairs during any twelve month period or (2) for less than eighteen months during any three-year period for any purpose plus 120 days for ordinary repairs during any twelve month period, and then resumed. ROH §§ 21–4.110(c)(2) and (5). This construction provides clarity and exactness to ROH § 21–4.110(c)(5), and moreover, it promotes the purpose of the ordinance, to "discourage the perpetuation" of nonconforming uses. ROH § 21–4.110(c).

3. *The resumption of the nineteen month cessation of the daytime operation of Michel's does not constitute an "action" which reduces the negative effects associated with the operation of the nonconforming use, and therefore, does not violate ROH § 21–4.110(c)(5)*

Under the foregoing interpretation of ROH § 21–4.110(c)(5), the January 1998 "daytime operation" of Michel's, which increased its hours of operation of Michel's since its cessation in October 1995, is not an "action" in violation of ROH § 21–4.110(c)(5), because Appellants discontinued these hours and reduced the negative effects within the permissible discontinuation of nonconforming use period.

Since its closure in October 1995 until January 1998, the regular daytime operation [11] of Michel's consisted of: (1) a Sunday brunch in

10. *See State v. Carmichael,* 99 Hawai'i 75, 97, 53 P.3d 214, 235 (2002) (Acoba, J., dissenting) (stating that "[s]tatutes are considered to be *in pari materia* when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object").

11. Although Michel's held two special lunch functions in fall 1996 and a breakfast and lunch function in 1997, they were so infrequent that they are not relevant in determining the regular daytime operation of Michel's. *See DiNardo v.*

*City of Pittsburgh,* 15 Pa.Cmwlth. 279, 325 A.2d 654, 658 (1974) ("After a cessation of activity by an owner, however, a mere casual, occasional and infrequent return to the original activity is not sufficient to continue or renew a prior nonconforming use, nor can a new, separate, and distinct enterprise gain the protection of the nonconforming use." (citing *W. Mifflin v. Zoning Hearing Bd.,* 3 Pa.Cmwlth. 485, 284 A.2d 320 (1971))).

August 1996 "for about a month," (2) a Sunday brunch from December 29, 1996 to June 15, 1997, and (3) 7:00 a.m. to 4:30 p.m. hours of operation beginning January 1998. Thus, the daytime operation of Michel's was temporarily ceased for *ten months* from October 1995 until August 1996, *three* months from September 1996 until December 1996, and *six months* from June 1997 until January 1998, for a total of *nineteen months* over a twenty-six month period.

However, between March 1996 and August 1996, Michel's was closed because of "extensive interior renovations," or "ordinary repairs." As construed *supra*, an owner, lessee, or authorized operator has 120 days to make "ordinary repairs," which are not counted as part of the permissible temporary cessation of the nonconforming use. ROH § 21–4.110(c)(5). Because the nineteen month discontinuation of the daytime operation of the nonconforming use included 120 days in which the owner of Michel's made "ordinary repairs," the daytime cessation of Michel's was within the permissible temporary discontinuation period of: (1) twelve consecutive months for any purpose and 120 days for ordinary repairs, and (2) eighteen months in a three year period for any purpose and 120 days for ordinary repairs. Therefore, Michel's is not precluded from resuming its daytime operations under ROH § 21–4.110(c)(5). We reverse the circuit court's rulings that: (1) Anderson's daytime hours of operation of Michel's was an " 'action' by Anderson which reversed a reduction in 'the negative effects associated with the operation' of Michel's within the meaning of ROH [§ ]21–4.110(c)(5)," and (2) "the daytime operation of Michel's violates ROH [§ ]21–4.110(c)(5)."

### C. The Circuit Court Erred By Concluding That The Daytime Operation of Michel's Violates ROH § 21–4.110(c)(1)

In their third point of error, Appellants assert that the circuit court erred by ruling that the "daytime operation of Michel's violates ROH § 21–4.110(c)(1)." As stated *supra*, there was no decrease in operating hours under ROH § 21–4.110(c)(5) and thus,

Appellants correctly assert that there was no increase in operating hours in violation of ROH § 21–4.110(c)(1). Therefore, we reverse the circuit court's conclusion that "[t]he daytime operation of Michel's violates [ROH § ]21–4.110(c)(1)."

## IV. CONCLUSION

Based upon the foregoing analysis, we hold that: (1) the issue as to whether the operation of Michel's as a different type of use constitutes an "expanded" nonconforming use within the meaning of ROH § 21–4.110(c)(1), was not properly before the circuit court, inasmuch as (a) CSL argued before the director that Michel's violated ROH § 21–4.110(c)(1) by increasing its hours of operation, (b) the director limited his review of the petition to whether Michel's was precluded from increasing its hours of operation pursuant to ROH § 21–4.110(c)(1), and (c) the ZBA was limited to rendering a decision regarding the additional hours of operation of Michel's; (2) ROH §§ 21–4.110(c)(2), (3), and (5), which have the same purpose, subject matter, and clarify what constitute permissible "actions" which reduce the negative effects associated with nonconforming uses, must be construed *in pari materia;* (3) Under ROH § 21–4.110(c)(5), a nonconforming use may be temporarily discontinued (constituting an "action" which reduces the negative effects) for (a) less than twelve consecutive months for any purpose plus 120 days for ordinary repairs during any twelve-month period or (b) for less than eighteen months during any three-year period for any purpose plus 120 days for ordinary repairs during any twelve month period, and then resumed; (4) the January 1998 "daytime operation" of Michel's, which increased the hours of operation of Michel's after temporarily discontinuing its daytime operation of the nonconforming use for nineteen months, including 120 days for "ordinary repairs," was permissible because the discontinuation was within the permissible temporary cessation period of: (1) twelve consecutive months for any purpose plus 120 days for ordinary repairs, and (2) eighteen months in a three year period for any purpose plus 120 days for ordinary repairs; and (5) the daytime operation of Mi-

chel's does not violate ROH § 21–4.110(c)(1), inasmuch as it did not "decrease" its operating hours under ROH § 21–4.110(c)(5) and therefore, did not "increase" its operating hours in violation of ROH § 21–4.110(c)(1).

Accordingly, we reverse the circuit court's July 23, 2003 judgment.

