198 P.3d 715

**SAVE DIAMOND HEAD WATERS LLC, a Hawaii limited liability corporation; Kapiolani Park Preservation Society, LLC, a Hawaii limited liability corporation; Mike Beason, an individual; and Richard K. Quinn, an individual, Appellants–Appellees,**

v.

**HANS HEDEMANN SURF, INC., Appellee–Appellant,**

and

**City and County of Honolulu, by and through the Department of Planning and Permitting, Appellee–Appellee,**

and

**McInery Foundation, a Hawaii corporation; and Hotel Kaimana, Inc., a Hawaii corporation, Appellees.**

No. 27804.

Intermediate Court of Appeals of Hawai'i.

Dec. 19, 2008.

William W.L. Yuen and Philip W.T. Chang (Ching, Yuen & Morikawa), on the briefs, Honolulu, for Appellee–Appellant Hans Hedemann Surf, Inc.

Dane L. Miller and Wilma Sur (Miller Tokuyama & Sur LLP), on the briefs, Honolulu, for Appellants–Appellees Save Diamond Head Waters, LLC, Kapiolani Park Preservation Society, LLC, Mike Beason, and Richard K. Quinn.

FOLEY, Presiding Judge, NAKAMURA and FUJISE, JJ.

Opinion of the Court by FUJISE, J.

Appellee–Appellant Hans Hedemann Surf, Inc. (Hedemann) appeals from the April 19, 2006 Amended Final Judgment on Administrative Appeal, Vacating and Modifying Decision of the Zoning Board of Appeals in Zoning Board of Appeal Matter Number 2004/ZBA–04, prohibiting Hedemann's operation of a surfing school out of the New Otani Kaimana Beach Hotel (the Hotel). Upon a careful review of the issues raised by Hedemann, the brief in opposition, the record, and the relevant authority, we reverse the decision of the Circuit Court of the First Circuit (circuit court).[1]

## I.

The essential facts in this case are undisputed and are taken largely from the circuit court's April 16, 2006 Amended Findings of Fact, Conclusions of Law, Decision and Order.[2] Hedemann operates Hans Hedemann

---

1. The Honorable Eden Elizabeth Hifo presided.

2. The circuit court's Findings of Fact, Conclusions of Law, Decision and Order were originally filed on February 8, 2006. On February 17, 2006, the Zoning Board of Appeals (ZBA) moved to amend the February 8, 2006 order because it

Surf School (Surf School), a commercial surfing school, at four Oʻahu locations. This dispute relates to the Surf School located on the ground floor (Shop # 7) of the Hotel. The Hotel consists of 124 units and is situated on Waikīkī beach, in the area makai[3] of Kapiʻolani Park and Kalākaua Avenue and between Kaimana Beach Park on the ʻEwa[4] side and various other properties on the opposite side.

The Hotel was constructed in 1950 and expanded in 1962. At the time it was built, the property underlying the Hotel was zoned as part of the Hotel and Apartment District "L." This zoning district did not allow for commercial uses other than businesses that primarily served the tenants and occupants of the buildings in which they were located, known as "accessory uses."[5]

On January 2, 1969, the Comprehensive Zoning Code took effect. This placed the Hotel into an A–4 Apartment District, which did not allow hotels. Again, only accessory commercial uses were permitted in buildings containing a minimum of 50 dwelling or lodging units and no external evidence of the existence of the accessory use was permissible.

On December 23, 1982, Ordinance 82–58 (the Land Use Ordinance (LUO) codified as ROH Chapter 21) changed the zoning of the Hotel to its current A–2 Medium Density Apartment District designation. Hotel and accessory uses are not permitted in A–2 districts. However, because hotel use was acceptable at the time of the Hotel's construction and the Hotel has continued to be used as a hotel, hotel use survives as a nonconforming use.[6]

---

would have amended the ZBA's decision so as to order the Director (Director) of the Department of Planning and Permitting of the City and County of Honolulu (DPP) to take steps to prevent the continued use of Shop # 7 as a surf school, which was beyond the ZBA's authority under the Revised Charter of the City & County of Honolulu 1973 (2000) (Charter) § 6–1516 and this court's decision in *Windward Marine Resort, Inc. v. Sullivan*, 86 Hawaiʻi 171, 948 P.2d 592 (App. 1997). The motion was granted on March 30, 2006. On April 19, 2006 the circuit court entered the amended order and amended final judgment.

3. "Makai" is a Hawaiian word meaning "on the seaside, toward the sea, in the direction of the sea." Mary Kawena Pukui, Samuel H. Elbert, *Hawaiian Dictionary*, 224 (rev. ed.1986).

4. " ʻEwa" is a "[p]lace name west of Honolulu used as a direction term." *Hawaiian Dictionary*, 42.

5. "Accessory use" is defined in the Revised Ordinances of Honolulu 1990(ROH) § 21–10.1 and provides:

"Accessory use" means a use which meets the following conditions:
(1) Is a use which is conducted on the same zoning lot as the principal use to which it is related whether located within the same building or an accessory building or structure, or as an accessory use of land;
(2) Is clearly incidental to and customarily found in connection with the principal use; and
(3) Is operated and maintained substantially for the benefit or convenience of the owners, occupants, employees, customers or visitors of the zoning lot with the principal use.

6. Nonconforming uses are governed by ROH § 21–4.110(c), which provides:

Nonconforming Uses. Strict limits are placed on nonconforming uses to discourage the perpetuation of these uses, and thus facilitate the timely conversion to conforming uses.
(1) A nonconforming use shall not extend to any part of the structure or lot which was not arranged or designed for such use at the time of adoption of the provisions of this chapter or subsequent amendment; nor shall the nonconforming use be expanded in any manner, or the hours of operation increased. Notwithstanding the foregoing, a recreational use that is accessory to the nonconforming use may be expanded or extended if the following conditions are met:
(A) The recreational accessory use will be expanded or extended to a structure in which a permitted use also is being conducted, whether that structure is on the same lot or an adjacent lot; and
(B) The recreational accessory use is accessory to both the permitted use and the nonconforming use.
(2) Any nonconforming use that is discontinued for any reason for 12 consecutive months, or for 18 months during any three-year period, shall not be resumed; however, a temporary cessation of the nonconforming use for purposes of ordinary repairs for a period not exceeding 120 days during any 12–month period shall not be considered a discontinuation.
(3) Work may be done on any structure devoted in whole or in part to any nonconforming use, provided that work on the nonconforming use portion shall be limited to ordinary repairs. For purposes of this subsection, ordinary repairs shall only be construed to include the following:

The record is unclear as to when the Hotel's use of Shop #7 ended and its use for commercial purposes began. As early as 1993, other commercial tenants used Shop #7 to rent out kayaks, body boards, surfing and other beach equipment. The record fails to establish whether the prior rental businesses constituted an accessory use or a non-accessory use, i.e., whether the customers of these businesses were primarily hotel guests or the general public.

Hedemann began renting Shop #7 on January 1, 2002. Hedemann both rents and sells equipment but primarily uses the space as "an assembly point for its clients." A "substantial portion" of Hedemann's customers are brought to the location via shuttle from other Waikīkī locations. At Shop #7, students are issued surfboards and they use the Hotel's property outside Shop #7 to reach the ocean, where surfing lessons are conducted.[7]

Although Shop #7 had been previously used to rent ocean equipment, Hedemann's use of Shop #7 generated "widespread local opposition." It is unclear from the record when that opposition began, but a petition signed by approximately 700 people objecting to the Surf School's activities was submitted

during these proceedings. In particular, area residents complained of noise, congestion, parking issues, vandalism, trespassing and "other ills" caused by the Surf School. Appellants–Appellees Save Diamond Head Waters LLC (a community organization including neighborhood residents), Kapiolani Park Preservation Society LLC (another community organization which also includes neighborhood residents),[8] Mike Beason and Richard K. Quinn (both residents of the Tropic Seas Condominium situated approximately 750 feet from the property) (collectively SDHW) filed a petition with the Director. The petition is not of record. The Director stated that a declaratory ruling was sought[9] on the question of whether the Surf School's operation was "in compliance with the regulations of the zoning ordinance for nonconformities. In particular, [SDHW was] concerned that the operation of the Surf School constitute[d] an unlawful expansion of a nonconforming use, and/or a change in use to one which has an adverse effect on its neighboring properties."

After consideration of the parties' submissions and the observations made by DPP personnel during a site visit, the Director

(A) The repair or replacement of existing walls, roofs, fixtures, wiring or plumbing; or
(B) May include work required to comply with federal mandates such as, but not limited to, the Americans with Disabilities Act (ADA) or the National Environmental Protection Act (NEPA); or
(C) May include interior and exterior alterations, provided that there is no physical expansion of the nonconforming use or intensification of the use.
Further, ordinary repairs shall not exceed 10 percent of the current replacement cost of the structure within a 12–month period, and the floor area of the structure, as it existed on October 22, 1986, or on the date of any subsequent amendment to this chapter pursuant to which a lawful use became nonconforming, shall not be increased.
(4) Any nonconforming use may be changed to another nonconforming use of the same nature and general impact, or to a more restricted use, provided. that the change to a more restricted use may be made only if the relation of the use to the surrounding property is such that adverse effects on occupants and neighboring properties will not be greater than if the original nonconforming use continued. Other than as provided as "ordi-

nary repairs" under subdivision (3), improvements intended to accommodate ·a change in nonconforming use or tenant shall not be permitted.
(5) Any action taken by an owner, lessee, or authorized operator which reduces the negative effects associated with the operation of a nonconforming use—such as, but not limited to, reducing hours of operation or exterior lighting intensity—shall not be reversed.

7. Hedemann has provided surfing instruction at the "Tongg's" and "Old Man's" surfing spots since approximately 1994. Prior to operating out of.Shop #7, Hedemann obtained access to the beach from various locations along the "Gold Coast," including the Diamond Head Beach Hotel and the Elks Club.

8. The Kapiolani Park Preservation Society joined in the petition after its original filing.

9. The circuit court found that the petition also sought a cease and desist order. However, the Director did not mention such a request in his ruling and the DPP rules governing declaratory rulings do not provide for such a remedy. Department of Planning and Permitting Rules of Practice and Procedure (DPP Rules), Chapter 3.

made findings of fact, conclusions of law, and a declaratory ruling dated June 30, 2004.

The Director determined that the Hotel was a nonconforming use and that, as the Surf School's students were drawn primarily from the general public and not guests of the Hotel, the Surf School's operation was not an accessory use of the Hotel.

He also found that "[t]here has been no physical expansion to any of the buildings on the site to accommodate the surf school establishment. There has been no increase in operating hours by the surf school beyond that of the hotel, and no increase in the density on the site as a result of the surf school's operations." Thus, the Director concluded, the Surf School qualified as a change in nonconforming use from accessory-hotel to principal-office use.

Finally, the Director also found that the Surf School "can involve greater adverse effects (in particular seawall congestion, noise, and incompatibility with surrounding residential and apartment uses) on surrounding properties within the neighborhood when the size of a surfing classes [sic] is too large." As a consequence, the Director set class size and number limits on the Surf School's operation.

SDHW appealed from the Director's ruling to the ZBA,[10] which conducted a contested-case hearing spanning several sessions. By decision entered on March 28, 2005, the ZBA affirmed the Director's ruling, stating that the Director's decision that Hedemann's use of Shop # 7 as an office for surfing instruction, subject to conditions, was not based on an erroneous finding of material fact and was not arbitrary or capricious nor an abuse of discretion.

SDHW appealed the ZBA decision to the circuit court.[11] The circuit court vacated the ZBA ruling, concluding that the Director's ruling was "arbitrary and/or capricious and constituted an abuse of discretion" and modified the ZBA's decision to reflect this conclusion. Hedemann timely filed his notice of appeal on March 6, 2006.

## II.

### A.

In its points on appeal, Hedemann challenges the circuit court's conclusions of law numbers 18 and 20 which state,

18. The Director's interpretation of the LUO grants broad authority to himself to allow certain variances by crafting his own conditions. This interpretation contradicts the City Charter, which imposes a detailed regulatory scheme for allowing variances.

. . . .

20. Thus, the Director's interpretation of the LUO to allow a LUO § 21-4.110(c)(4) exception notwithstanding adverse effects of the new nonconforming use on the neighboring parcels and occupants, was in violation of the ordinance itself, in violation of the Revised City Charter, exceeded the Director's authority and the jurisdiction of the agency and the Director's order was made upon unlawful procedure. Accordingly, the determinations of the Director and the ZBA below were contrary to (1) the LUO and (2) the Revised City Charter and (3) in excess of the Director's authority. Pursuant to HRS § 91–14(1), (2) and (3), the determinations of the ZBA are overruled.

Hedemann argues that the circuit court was wrong in concluding that the Director acted outside of his authority as, according to

10. The Charter provides for an appeal to the ZBA in § 6–1516:

There shall be a zoning board of appeals which shall consist of five members. The board shall be governed by the provisions of Section 13–103 of this charter. The zoning board of appeals shall hear and determine appeals from the actions of the director in the administration of the zoning ordinances, including variances therefrom, subdivision ordinances and any rules and regulations adopted pursuant to either. An appeal shall be sus-

tained only if the board finds that the director's action was based on an erroneous finding of a material fact, or that the director had acted in an arbitrary or capricious manner or had manifestly abused discretion.

11. The parties named by SDHW as Respondents included the McInerny Foundation (fee owner of the land), Hotel Kaimana, Inc. (lessee and hotel operator), Hedemann, and the City and County of Honolulu by and through the DPP.

the powers given to him by the Charter and the LUO, the Director had the authority to "define[ ] a level of usage of [Shop # 7] that would have an adverse effect on the neighboring properties." Hedemann asserts that an administrative agency must have the power to do what is reasonably necessary to carry out its duties and the Director had to determine the point at which the activity would adversely affect surrounding properties in order to enforce the ordinance. Therefore, Hedemann argues, the language in the Director's order should be understood as properly defining a level of acceptable use, rather than "craft[ing] conditions" to limit the existing adverse effects caused by Hedemann's use of the property.

Thus, the question before us is whether the Director, in response to SDHW's petition for a declaratory ruling, acted beyond his authority to issue that ruling when it set the permissible limits of a lessee's use of its leased space under the LUO.

### B.

█ When an appellate court reviews a circuit court's review of an agency decision, it is considered a secondary appeal. *Citizens Against Reckless Dev. v. Zoning Bd. of Appeals,* 114 Hawai'i 184, 193, 159 P.3d 143, 152 (2007). In secondary appeals, the "standard of review is one in which th[e] court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [1993] to the agency's decision." *Id.* (citing *Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998)). HRS § 91–14(g) provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

█ Thus, conclusions of law should be reviewed de novo under subsections (1), (2), and (4); and factual determinations should be reviewed for clear error under subsection (5). *Citizens Against Reckless Dev.,* 114 Hawai'i at 193, 159 P.3d at 152 (citation omitted); *see also Morgan v. Planning Dep't,* 104 Hawai'i 173, 179, 86 P.3d 982, 988 (2004) (citation omitted). If both mixed questions of fact and law are presented, the clearly erroneous standard is used "because the conclusion is dependent upon the facts and circumstances of the particular case." *In re Contested Case Hearing on Water Use Permit Application Filed by Kukui (Molokai), Inc.,* 116 Hawai'i 481, 489, 174 P.3d 320, 328 (2007) (citation omitted). An agency's exercise of discretion is reviewed for abuse under HRS § 91–14(g)(6).

█ "[D]eference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency." *Dole Hawaii Div.-Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990) (citation omitted). "An agency's interpretation of its rules receives deference unless it is plainly erroneous or inconsistent with the underlying legislative purpose." *Hawaii Teamsters & Allied Workers, Local 996 v. Dep't of Labor & Indus. Relations,* 110 Hawai'i 259, 265, 132 P.3d 368, 374 (2006) (citation omitted).

In determining whether an agency determination should be given deference, the standard to be applied is as follows:

[W]hen reviewing a determination of an administrative agency, we first decide whether the legislature granted the agency discretion to make the determination being reviewed. If the legislature has granted the agency discretion over a particular matter, then we review

the agency's action pursuant to the deferential abuse of discretion standard (bearing in mind that the legislature determines the boundaries of that discretion). If the legislature has not granted the agency discretion over a particular matter, then the agency's conclusions are subject to de novo review.

*Paul's Electrical Service, Inc. v. Befitel,* 104 Hawai'i 412, 419–20, 91 P.3d 494, 501–502 (2004).

*Olelo: The Corp. for Cmty. Television v. Office of Info. Practices,* 116 Hawai'i 337, 344, 173 P.3d 484, 491 (2007).

### C.

Under the Charter, the Director is charged with, among other responsibilities, the administration and enforcement of the zoning ... ordinances, and rules and regulations adopted thereunder, and any regulatory laws or ordinances which may be adopted to supplement or replace such ordinances.

Charter § 6–1503(j).

■ The DPP Rules explicitly provide for the issuance of written interpretations to clarify provisions of the LUO "to review specific provisions for intent, clarity and applicability to a particular situation." DPP Rules §§ 7–1 and 7–2 (2004). In addition, pursuant to HRS § 91–8,[12] "interested person[s]" may petition the director of the DPP "as to the applicability of any statute or ordinance relating to the department." DPP Rules § 3–1;[13] *see also Citizens Against Reckless Dev.,*

114 Hawai'i at 197, 159 P.3d at 156 (the use of this procedure "makes sense" where agency has not yet acted or "applicability of some provisions of law have not been brought into consideration"). Therefore, the issuance of a ruling regarding the applicability of some provision of the LUO is within the discretion of the Director and that ruling is entitled to the deferential abuse-of-discretion standard of review. *Id.* at 200, 159 P.3d at 159.

### D.

In the instant case, SDHW took advantage of the option to obtain a declaratory ruling when it filed its petition with the Director. As described by the Director, SDHW asked for a ruling on whether Hedemann's Surf School "operates in compliance with the regulations of the zoning ordinance for nonconformities[,]" and whether the Surf School "constitutes an unlawful expansion of a nonconforming use, and/or a change in use to one which has an adverse effect on its neighboring properties."

The Director ruled that the Hotel itself is a nonconforming use and although "accessory" commercial businesses are allowed within the Hotel, the operation of the Surf School was not an accessory use, because it did not draw its students/customers primarily from the Hotel. The Director also ruled that the Surf School's operation did not represent an expansion of the nonconforming use as there had been no physical expansion of the existing structure, no extension of operating

---

12. HRS § 91–8 provides,

> Any interested person may petition an agency for a declaratory order as to the applicability of any statutory provision or of any rule or order of the agency. Each agency shall adopt rules prescribing the form of the petitions and the procedure for their submission, consideration, and prompt disposition. Orders disposing of petitions in such cases shall have the same status as other agency orders.

13. "Any interested person" may petition for a declaratory ruling regarding the applicability of any statute or ordinance relating to, or any rule or order of, the DPP. DPP Rules § 3–1. However, the Director may refuse to issue a declaratory ruling for the following reasons:

(1) The question is speculative or hypothetical and does not involve existing facts, or facts which can reasonably be expected to arise within the next year.

(2) The petitioner's interest is not of the type which would give him/her standing to maintain an action if he/she were to seek judicial relief.

(3) The issuance of the declaratory ruling may adversely affect the interests of the city in any litigation which is pending or may reasonably be expected to arise.

(4) The matter is not within the jurisdiction of the department.

(5) For other good cause.

DPP Rules § 3–5. The applicability of the declaratory ruling is also limited "to the factual situation stated in the petition or set forth in the ruling. A declaratory ruling shall not apply to situations where the facts are different or where there are additional facts." DPP Rules § 3–6.

hours insofar as the Hotel operated on a 24–hour basis, no evidence of an increase of "visitor units" within the Hotel or any other increase in density or intensity of use on the site. The Director concluded that the Surf School was more properly characterized as a change of use rather than an expansion of the nonconforming use and that the activities conducted on-site—assembly and registration of, and distribution of surfboards to students, as opposed to actual instruction—was an "office" use. The ZBA agreed [14] with the Director on these matters.

Thus, the issue before the circuit court and before this court is whether the Director abused his discretion by issuing a declaratory ruling that Hedemann's use of Shop # 7 was a proper change in nonconforming use so long as that use remained within certain limits.

### E.

Changes in nonconforming uses are governed by LUO § 21–4.110(c)(4), which provides,

> Any nonconforming use may be changed to another nonconforming use of the same nature and general impact, or to a more restricted use, provided that the change to a more restricted use may be made only if the relation of the use to the surrounding property is such that adverse effects on occupants and neighboring properties will not be greater than if the original nonconforming use continued. Other than as provided as "ordinary repairs" under subdivision (3), improvements intended to accommodate a change in nonconforming use or tenant shall not be permitted.

The Director, in reaching his decision in this case, relied on the interpretive decision on change in nonconforming uses, issued by a previous director in 1988, that explained,

> [t]here is no truly scientific method of comparing uses to determine whether one is more intensive than another. Frequently, the decision is not difficult because the uses in question belong to different "families", i.e., residential versus commercial, or commercial versus industrial.
>
> In other instances, distinctions are blurred although intuitively it is apparent that one use is more intensive than another. The guidelines are intended to assist in making this decision.
>
> These guidelines parallel the criteria upon which conditional uses are evaluated. New nonconforming uses and conditional uses both represent the introduction of types of different uses into otherwise homogeneous neighborhoods.

DPP Interpretation No. 88/INT–6 (Dec. 19, 1988).[15] The interpretation set the following guidelines for determining whether a change in nonconforming use was permissible:

> Each change in use shall be evaluated on a case-by-case basis, using the following guidelines for decision-making:

| Hours of operation | Are the hours longer or changed in a way which may create conflicts with surrounding conforming uses? |
| --- | --- |
| Clientele volume | Are more clients or visitors expected to be attracted to the site? |
| Parking | Is the parking standard higher, or is the parking demand expected to be higher? |
| Traffic | Will the new use attract heavier vehicles or greater frequency of vehicle trips? |
| Noise | Is more noise expected? During night hours? |
| Adjacent land uses | Compared to the previous nonconforming use, is the proposed use compatible with existing surrounding uses? With conforming use? |

> Nonconforming commercial accessory uses in Waikiki would be allowed to continue even if the building is converted to apartment use.

The Director's analysis in this case was as follows:

> C. *Change in Nonconforming Use:* When the hotel was established through

---

14. The vote of the ZBA was three in favor and two against.

15. The interpretation refers to LUO § 3.120–4, titled "Changing one nonconforming use to another use." The text of the section is identical, but the LUO was renumbered pursuant to Ordinance 99–12 in 1999.

the issuance of a building permit in 1950, use regulations did not permit commercial uses other than restaurants in the Hotel–Apartment District. Later, in 1957, amendments to the Hotel–Apartment District use regulations allowed for certain commercial uses, provided they were strictly accessory to the hotel. The size and density of the hotel was significantly expanded in 1962 under those use regulations. But, the zoning of the site was changed to A–4 Apartment District soon thereafter, even before construction of the hotel tower was finished. Commercial uses are not permitted under the use regulations of the apartment zoning assigned to the site ever since. However, current zoning regulations clearly permit changes in nonconforming use under LUO Section 21–4.110(c)(4), provided the change in use does not result in greater adverse effects for occupants and neighboring properties. This means that any of the ground-floor commercial uses on the site considered principal uses, including the surf school, are permissible so long as their impact on surrounding properties is no greater than that of the hotel use.

D. *Adverse Effects:* Whether the surf school is permitted to operate on the hotel property depends on whether its adverse effects on the properties in the surrounding neighborhood are greater than that of the hotel. [Note: For purposes of the LUO and this Declaratory Ruling, these would include adverse effects on the various land uses within the neighborhood, including the seawall, rather than on the ocean itself.] The LUO does not stipulate criteria that must be applied to changes in nonconforming use in order to determine whether a greater adverse effect will occur, so changes in nonconforming use must be evaluated on a case-by-case basis. Interpretation No. 88/INT–6, issued by the DPP on December 19, 1988, addresses how changes in nonconforming use can be evaluated by providing guidelines for decision-making on whether a proposed change in use may involve greater adverse effects. Although these guidelines, as they are specifically written, may not necessarily be definitive for all cases, they do provide an appropriate model for the purposes of this Analysis.

1. *Hours of Operation:* The operating hours of the surf school (8:30 a.m. to 5:30 p.m.) are not unusual for a daytime business, and are not longer than those of the hotel, which essentially operates 24 hours-per-day.

2. *Clientele Volume:* Information available to the DPP concerning the number of surf school customers ("students") indicates that class size varies greatly. On the morning DPP staff performed its site visit, there were only 4 students and 2 instructors. [Note: This is consistent with the surf school's advertising which indicates a student to instructor ratio of 4 to 1.] The surf school has stated that it now limits itself to a maximum of 15 students per session, and advertises up to 3 sessions per day. The Petitioners assert that classes can involve as many as 50 people, which is corroborated by other observers (e.g., the Kaimana Beach Park lifeguard). This is a wide range. Unfortunately, there is no relevant information available to the DPP at this time regarding what would be a normal or appropriate size for a surfing class. Therefore, an evaluation of reasonableness and equity will have to suffice in analyzing the impact of client volume.

For purposes of this Analysis, it seems reasonable to conclude that the impact of the change in use to a surf school operating on the grounds of the hotel should be no greater than if it operated as an accessory use of the hotel. At issue then is the level of activity or intensity of use which results in greater adverse effects. DPP staff observed no significant impacts associated with the surf school activities on the morning they conducted their site visit. At that time, there were only 4 students in the class. On the other hand, a large number of complaints from area residents, over a

sustained period of time, clearly indicates that there are adverse effects associated with the surf school's activities, particularly when class size is large. Relevant nuisances include noise (shouting and yelling) and congestion at the seawall. Further, it would be difficult to find that a class involving 30 to 50 students would be typical for an accessory use of a 124-unit hotel.

The surf school operator has stated that it limits itself to 15 students per class. [Note: The Petitioners assert that the surf school operator has been exceeding this limit with the advent of the summer season.] DPP staff discussed this with the Oahu Boating Manager (of the Boating Division), who seemed to feel that a maximum surfing class of that size at *Tongg's* might be appropriate. Discussions DPP staff has had with local area surfers resulted in various recommendations for a maximum class size at *Tongg's* ranging from 6 to 15 people as an appropriate limit to control the related impacts. The midpoint of this range is about 11. It is reasonable, therefore, to conclude that a limit of 12 students per session (with no more than 3 sessions per day) could be sufficient to control the related adverse effects. A surfing class with 12 students would include 3 instructors (using the operator's own ratio of 4 to 1), for a total class size of 15 people. It should be noted that the impacts herein discussed essentially relate to the ocean activity itself, i.e., the surfing instruction, rather than the operation of the surf school's office on the hotel site. This raises legitimate issues as to whether the surf school [office] use is responsible for the relationship between the adverse effects and the surrounding properties within the neighborhood. The surfing instruction activity occurs on another site completely, hundreds of yards to the south and offshore. However, the surf school does function as the point of origin for the related impacts. The students assemble on the site to register and be issued their equipment (surf boards). Then, they depart from the site onto the beach park and into the water where the impacts occur. While the related impacts do not occur on the hotel site, the surf school office acts as a source nonetheless; i.e., the impacts come, if not exactly from the site, then through the site. The surf school office is a conduit for the activities which have the potential to create adverse effects. An [sic] valid argument can therefore be made that by controlling the volume of students which flow from the on-site source, control can be exercised upon the level of adverse effects that eventually occur off-site.

3. *Parking:* The Petitioners allege parking impact as one of the adverse effects associated with the surf school. However, the documentation submitted to the DPP does not indicate how parking demand has been a problem directly associated with the operation of the surf school. It appears that most of the surf school's customers are tourists from Waikiki. The surf school provides transportation to the site as part of its overall service. Some of the surf school's students no doubt arrange for their own transportation, but it seems reasonable to conclude that most of them utilize the transportation provided by the surf school. Therefore, it seems unlikely that the surf school use would necessarily generate a great deal of additional parking demand within the surrounding neighborhood. Rather, related transportation more typically involves drop-offs and pick-ups on the hotel property. This is a common enough activity associated with hotel operations. In the absence of any evidence to the contrary, it seems reasonable to conclude that parking is not a significant impact directly attributable to the change in use.

4. *Traffic:* One of the impacts Petitioners mention is increased pedestrian traffic:

*[Large] crowds of people traversing Sans Souci Beach and thereafter congregating in the surf breaks to the exclusion of casual surfers. Additionally, crowds of students and well wishers congregate on the narrow sea walls that front the breaks and adjoin the condos and apartments on the Gold Coast. These seawalls are very narrow and the noisy spectators block egress and ingress and disturb the occupants of the apartments.*

As a land use issue, congestion at the seawall is relevant, as it has a direct impact on the residents of the surrounding properties. The seawall is narrow, about 3 feet wide, and functions as a public beach right-of-way for the neighborhood. It is reasonable to conclude that pedestrian traffic along the seawall will increase in proportion to the size of the surfing class, since the number of bystanders and well wishers associated with surfing students will increase correspondingly, resulting in seawall congestion.

5. *Noise:* Noise involving yelling, cheering, and instructors shouting instructions to students has been shown to be one of the major problems associated with the surf school. This noise has a direct impact on the quality of life for the residents of the surrounding properties, since it effects [sic] the peace and quiet of the neighborhood. And, it is reasonable to conclude that the noise impacts increase with class size.

6. *Adjacent Land Uses:* Seawall congestion and noise associated with large surfing classes are nuisances for the surrounding apartments and condominiums within the surrounding neighborhood. The zoning of this area is predominantly A–2 Apartment and R–5 Residential Districts. Dwellings are the predominant land use for these zoning districts. The potential nuisances associated with the surf school operations in the area suggest its incompatibility with the surrounding, conforming uses within the neighborhood; disrupting the quality of life, and peace and quiet of the neighborhood. However, these nuisances manifest themselves when the size of the surfing classes becomes too large. At an appropriate scale, congestion and noise are not apparent nuisances.

The Petitioners also allege vandalism and trespassing by surf school students. However, the documentation they provided to the DPP was not sufficient to demonstrate that the surf school operations are directly responsible for such acts. [Note: Surf school employees have also made accusations of retaliatory vandalism to surf school property.] In any event, these are criminal matters which should be investigated by the Honolulu Police Department when they occur.

The DPP is not aware of any historical adverse effects associated with the operation of the nonconforming hotel on the site similar to those associated with the surf school relative to noise, seawall congestion, and incompatibilities with surrounding and conforming uses on the properties in the surrounding neighborhood. The relationship between the surf school and these adverse effects are apparently associated with large surfing class size, and should be controlled by limiting class size. If the adverse effects can be controlled by limiting class size, then the surf school's activities should not have an impact greater than if [the] surf school operated as accessory use of the hotel. The class size should be limited to no more than 12 students per session, and no more than 3 sessions per day. The surf school operator should also take appropriate actions to minimize congestion along the seawall adjacent to the shoreline in the vicinity of its activities during the periods of its surfing instruction.

Finally, it is the operator's responsibility to comply with these controls. Failure to comply may necessitate a reevaluation

by the DPP concerning its conclusions about the ability to mitigate the related adverse effects of the surf school on the surrounding neighborhood. If the adverse effects cannot be adequately controlled·as discussed herein, then the conclusions reached by this Analysis may need to be revised accordingly, and, a conclusion that this particular change in nonconforming use cannot be permitted under any conditions.

(Italicized emphasis and some bracketed material in original; record citations omitted).

Thus, the essence of the Director's ruling was that any adverse effects of the operation of the Surf School were a function of the number of students, not the operation of a surfing school per se. Consequently, the Director ruled that, so long as the class size of the school remained small enough to avoid causing the adverse effects complained of, the operation of the Surf School was a permissible change in nonconforming use.

In deciding SDHW's appeal, the circuit court focused on the Director's decision and concluded in relevant part,

14. Whether the Director has the authority under the LUO and the City Charter to craft "conditions" to a change in nonconforming use in order that the adverse effects on neighboring properties will not be greater than the original nonconforming use, and thereby bring a change in nonconforming use within the ambit of the LUO § 21–4.110(c) exception, is a legal question subject to *de novo* review. It requires the interpretation of the governing statutes, including the LUO and the Honolulu Revised City Charter.

15. No provision of the City Charter grants the Director the power to craft conditions to ameliorate adverse effects of a change in nonconforming use on neighboring properties, so that the LUO § 21–4.110(c)(4) exception can be used.

16. No provision in the LUO, and particularly LUO § 21–4.110(c), gives the Director the power to craft conditions to ameliorate adverse effects of a change in nonconforming use on neighboring properties so that the LUO § 21–4.110(c)(4) exception can be used. The ordinance implies the opposite: "Strict limits are placed on nonconforming uses to discourage the perpetuation of these uses and thus facilitate the timely conversion to conforming uses ..."

17. The Director interpreted the LUO § 21–4.110(c) to permit a change from one nonconforming use to a new nonconforming use, notwithstanding adverse effects from the nonconforming use, subject only to conditions he imposes to limit such adverse effects.

18. The Director's interpretation of the LUO grants broad authority to himself to allow certain variances by crafting his own conditions. This interpretation contradicts the City Charter, which imposes a detailed regulatory scheme for allowing variances.

19. The Land Use Ordinance is subordinate to the City Charter. Any interpretation of the LUO which conflicts with the Charter is contrary to law:

The proposition is self-evident that an ordinance must conform to, be subordinate to, not conflict with, and not exceed the charter, and can no more change or limit the effect of the charter than a legislative act can modify or supersede a provision of the constitution of the state. Ordinances must not only conform with the express terms of the charter, but they must not conflict in any degree with its object or with the purposes [of the charter].

*Harris v. De Soto,* 80 Hawai'i 425, 431, 911 P.2d 60, 66 (1996), *citing, Fasi v. City Council,* 72 Haw. 513, 518, 823 P.2d 742, 744 (1992). *Accord, Neighborhood Board No. 24 (Waianae Coast) v. State Land Use Commission,* 64 Haw., 265, 639 P.2d 1097 (1982).

20. Thus, the Director's interpretation of the LUO to allow a LUO § 2l–4.ll0(c)(4) exception notwithstanding adverse effects of the new nonconforming use on the neighboring parcels and occupants, was in violation of the ordinance itself, in violation of the Revised City Charter, exceeded the Director's authority and the jurisdiction of the agency and the Director's order was made upon unlawful procedure. Accord-

ingly, the determinations of the Director and the ZBA below were contrary to (1) the LUO and (2) the Revised City Charter and (3) in excess of the Director's authority. Pursuant to HRS § 91–14(1), (2) and (3), the determinations of the ZBA are overruled.

22. The Director's failure to follow the LUO and the Honolulu Revised City Charter has allowed the surf school's operation to continue in spite of the adverse impacts caused by such operation. Given the amount of materials submitted in the record cataloguing adverse impacts associated with the surf school and the lengthy period the surf school has been operating on the Property, the Court finds that substantial rights of the Petitioners have been prejudiced.

23. The Court, in light of its decision here, does not reach other issues raised by Petitioners, including the lawfulness of (1) the delegation by the Director of his authority to a private entity; (2) the Director's determination that the change from a hotel use to a commercial use and then a change from an accessory commercial use to a non accessory commercial [sic] do not constitute a forbidden "expansion of use"; and (3) the Director's finding that the nonconforming surf school use was of the "same nature and general impact" as the hotel use.

■ We cannot agree with the circuit court's reading of the Director's ruling. The Director's ruling showed a careful review of the evidence presented and analyzed that evidence by closely tracking the provisions of the LUO and the interpretation previously issued regarding a change in use. It did not, as characterized by the circuit court, grant a variance or exception to the LUO provision governing changes in nonconforming uses. Indeed, the Director never explicitly ruled that Hedemann violated the provisions of the LUO and, as such, would have had no reason to grant a "variance."

It is true that the Director found that there were adverse effects associated with Hedemann's use when the class size was large. This finding was supported by the evidence and is not in dispute. However, the Director also observed that on the date of the site visit there was no indication of adverse effects from the class composed of four students. Thus, the Director's operating theory, that the level of adverse effects could be controlled by controlling the class size, seems to be a reasonable one.

The Director then set the standard for the impact of a surfing class as "no greater than if it operated as an accessory use of the hotel" and focused on determining "the level of activity or intensity of use which results in greater adverse effects." [16] The Director considered that on the date of the site visit only four students were observed and the DPP staff observed no significant impacts associated with the surfing class, that Hedemann had reported that it limited class size to 15 students, and that discussions with surfers in the area recommended a range of six to fifteen students as a suitable maximum class size "to control the related impacts." Based on this information, the Director ruled that a maximum of twelve students and three instructors, or fifteen people total per class, with three surfing classes per day constituted a permissible change in use and that a use in excess of these limits would constitute a violation of LUO § 21–4.110(c)(4). This ruling was reasonably based on the evidence before the Director and constituted a reasonable application of the applicable zoning ordinance and the DPP's previous interpretation of that ordinance. Therefore, the Director's ruling was not an abuse of discretion.

### F.

■ Before this court, SDHW argues that because the Director found the operation of the Surf School had adverse effects on the surrounding neighborhood, the Director had no authority to "cure" these effects by setting limits on the school's operation. Again, we do not read the Director's ruling in such a manner. SDHW brought their petition asking for a declaratory ruling on whether the Surf School "operates in compliance with the

---

**16.** LUO § 21–4.110(c)(4) does not prohibit *any* adverse effects, only those adverse effects at a

level greater than those caused by the original nonconforming use.

regulations of the zoning ordinance for non-conformities" and particularly whether the operation constitutes an unlawful expansion of a nonconforming use and/or a change in use that had an adverse effect on the neighboring properties. The Director answered this inquiry.

Moreover, SDHW's argument assumes, without authority, that if a use did have additional adverse effects, the use of the property could not continue after being modified to avoid the additional adverse effects. For example, as argued by the DPP before the ZBA, a nonconforming grocery store that operated during daylight hours that expanded its hours to a round-the-clock operation could be allowed to continue if it limited its hours back to the nonconforming daylight hours. In short, even where the property owner expanded the use of the property beyond permissible limits, the LUO does not prevent a use that is scaled back to those permissible limits.

SDHW also claims that Hedemann's argument on appeal lacks substance insofar as he raises an irrelevant takings issue. However, SDHW misunderstands Hedemann's argument. Hedemann does not raise a takings issue in this case, nor does he challenge the constitutionality of the zoning ordinances. Rather, Hedemann engages in a general policy discussion of zoning regimes to show that as a matter of policy, Hawai'i balances the interests of vested landowners against the goal of homogenous land use. Thus, Hedemann argues that because the Director is not obligated to eliminate all nonconforming uses, the Director retains some discretion in his decision making. *See Rees v. Carlisle,* 113 Hawai'i 446, 456, 153 P.3d 1131, 1141 (2007) (quoting *City and County of Honolulu v. Sherman,* 110 Hawai'i 39, 57 n. 7, 129 P.3d 542, 559 n. 7 (2006) ("judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them")).

■ Finally, SDHW makes a number of arguments they claim are alternative justifications for the circuit court's decision. First, they argue that by directing Hedemann to take appropriate action to keep the seawall free from congestion, the Director illegally delegated his authority to a private entity. However, SDHW does not explain exactly what authority was delegated and how directing a private individual to take a specific action, e.g., to keep the seawall free from congestion, absolves the Director from fulfilling his responsibility to administer and enforce the land use laws. This falls far short of entrusting a private entity with the task of developing and enforcing native Hawaiian gathering rights as was the case in *Ka Pa'akai O Ka'aina v. Land Use Commission,* 94 Hawai'i 31, 7 P.3d 1068 (2000).

SDHW also argues that by 1) relying on unspecified "DPP Regulations" and 2) allowing a change from an accessory use to a non-accessory/principal use, the Director's ruling was in violation of LUO § 21–4.110(c)(1), which prohibits expansion of a nonconforming use "in any manner." As the Director issued his ruling based on a reasonable interpretation of another provision of the LUO, specifically LUO § 21–4.110(c)(4), it was authorized.

■ Finally, SDHW argues, based on "LUO § 21–4.110(c)," that the circuit court "could have" based its decision on the fact that the ZBA improperly placed the burden of proving a violation of the LUO on SDHW rather than Hedemann to prove that it was entitled to "a non-conforming use." As SDHW does not explain how the ZBA improperly shifted the burden imposed under LUO § 21–4.110, we decline to address this argument.

### III.

Accordingly, the April 19, 2006 Amended Final Judgment on Administrative Appeal, Vacating and Modifying Decision of the Zoning Board of Appeals in Zoning Board of Appeal Matter Number 2004/ZBA–04 entered in the Circuit Court of the First Circuit is reversed.