211 P.3d 74

**SAVE DIAMOND HEAD WATERS LLC.,** a Hawaii limited liability corporation; Kapiolani Park Preservation Society, LLC, a Hawaii limited liability corporation; Mike Beason, an individual; and Richard K. Quinn, an individual, Petitioners/Appellants–Appellees,

v.

**HANS HEDEMANN SURF, INC.,** Respondent/Appellee–Appellant,

and

City and County of Honolulu, by and through the Department of Planning and Permitting, Respondent/Appellee–Appellee,

and

McInery Foundation, a Hawaii corporation; and Hotel Kaimana, Inc., a Hawaii corporation, Respondents/Appellees–Appellees.

No. 27804.

Supreme Court of Hawai'i.

July 13, 2009.

Dane L. Miller and Wilma Sur (of Miller Tokuyama & Sur, LLP), Honolulu, for petitioners/appellants-appellees, Save Diamond Head Waters, LLC; Kapiolani Park Preservation Society, LLC; Mike Beason; and Richard K. Quinn.

William W.L. Yuen and Philip W.T. Chang (of Ching, Yuen & Morikawa), Honolulu, for respondent/appellee-appellant, Hans Hedemann Surf, Inc.

Don S. Kitaoka, Deputy Corporation Counsel, for respondent/appellee-appellee, City and County of Honolulu, by and through the Department of Planning and Permitting.

MOON, C.J., NAKAYAMA, ACOBA, and DUFFY, JJ., and Circuit Judge ALM, Assigned by Reason of Vacancy.

Opinion of the Court by DUFFY, J.

Petitioners/Plaintiffs–Appellees Save Diamond Head Waters, LLC; Kapiolani Park Preservation Society, LLC; Mike Beason; and Richard K. Quinn (collectively SDHW) filed a timely Application for Writ of Certiorari (Application) urging this court to review the January 9, 2009 judgment of the Intermediate Court of Appeals (ICA) based on its Opinion in *Save Diamond Head Waters, LLC. v. Hans Hedemann Surf, Inc. (SDHW)*, No. 27804, 119 Hawai'i 452, 198 P.3d 715 (App.2008). The ICA's Opinion reversed the circuit court of the first circuit's [1] (circuit court) April 19, 2006 Amended Final Judgment on Administrative Appeal, Vacating and Modifying Decision of the Zoning Board of Appeals Matter Number 2004/ZBA–04.

---

1. The Honorable Eden Elizabeth Hifo presided.

In its Application, SDHW presented the following questions:

1. Must a reviewing court use the *de novo* standard of review to ascertain the scope of authority granted to an administrative agency by a legislative body?

2. Does an administrative agency (here the [Department of Permitting and Planning (DPP)]) have the power to craft and interpret administrative rules in a fashion contrary to the plain language of the governing ordinances?

3. Must an administrative agency apply existing statutory standards when exercising its quasi-judicial function or may it ignore such standards and craft new "reasonable" standards?

4. Must the reviewing courts consider and apply the statutorily imposed standards in reviewing the quasi-judicial determinations of the agency?

5. Does an administrative agency exceed its power by conditioning a zoning variance on the applicant undertaking to fulfill a public police function, such as maintaining order on a seawall hundreds of yards from the applicant's premises?

We accepted SDHW's Application on March 16, 2009, and oral argument was held on May 7, 2009.

For the following reasons, we (1) vacate the ICA's Opinion and (2) affirm the circuit court's amended final judgment on the grounds that the Director's mixed finding of fact and conclusion of law that the Hans Hedemann Surf, Inc.'s (Surf School) use of the New Otani Kaimana Beach Hotel's (Hotel) premises was a permissible change in nonconforming use was clearly erroneous as it is not supported in the record.

## I. BACKGROUND

### A. Factual Background

The ICA set forth the following facts in its opinion:

Hedemann operates Hans Hedemann Surf School (Surf School), a commercial surfing school, at four Oʻahu locations. This dispute relates to the Surf School located on the ground floor (Shop # 7) of the Hotel. The Hotel consists of 124 units and is situated on Waikīkī beach, in the area makai [2] of Kapiʻolani Park and Kalākaua Avenue and between Kaimana Beach Park on the ʻEwa [3] side and various other properties on the opposite side.

The Hotel was constructed in 1950 and expanded in 1962. At the time it was built, the property underlying the Hotel was zoned as part of the Hotel and Apartment District "L." This zoning district did not allow for commercial uses other than businesses that primarily served the tenants and occupants of the buildings in which they were located, known as "accessory uses." [4]

---

2. " 'Makai' is a Hawaiian word meaning 'on the seaside, toward the sea, in the direction of the sea.' " *SDHW*, 119 Hawaiʻi at 455 n. 3., 198 P.3d at 718 n. 3 (quoting Mary Kawena Pukui, Samuel H. Elbert, *Hawaiian Dictionary*, 224 (rev. ed.1986)).

3. " 'Ewa' is a '[p]lace name west of Honolulu used as a direction term.' " *SDHW*, 119 Hawaiʻi at 455 n. 4, 198 P.3d at 718 n. 4 (quoting *Hawaiian Dictionary* at 42).

4. At the time the Hotel was expanded, business uses were prohibited within hotel and apartment districts. Revised Ordinances of Honolulu (ROH) § 21-3.1 (1957). However, accessory uses were permitted as follows:

[C]ertain accessory uses incidental to and customarily conducted within hotel and apartment districts shall be permitted and allowed,

provided they are in compliance with all existing laws, ordinances, and regulations applicable thereto. The term "accessory uses" shall include, without limiting the generality of its meaning, restaurants, barber shops, beauty parlors, massage studios, haberdasheries, wearing apparel shops, flower shops, newsstands, gift shops and other personal service shops.

ROH § 21-3.1(a). Accessory uses were limited to apartments and hotels with more than twenty rooms. ROH § 21-3.1(a)(1). Additionally, the "personal shops and businesses shall be operated primarily as a service to and for the convenience of the tenants and occupants of the building in which such services are located[.]" ROH § 21-3.1(a)(2). Further, no doors, entrances, signs, advertisements, or displays could be located on the exterior of the buildings. ROH § 21-3.1(a)(3)–(4).

"Accessory use" is currently defined as follows:

On January 2, 1969, the Comprehensive Zoning Code took effect. This placed the Hotel into an A–4 Apartment District, which did not allow hotels. Again, only accessory commercial uses were permitted in buildings containing a minimum of 50 dwelling or lodging units and no external evidence of the existence of the accessory use was permissible.

On December 23, 1982, Ordinance 82–58 (the Land Use Ordinance (LUO) codified as ROH Chapter 21) changed the zoning of the Hotel to its current A–2 Medium Density Apartment District designation. Hotel and accessory uses are not permitted in A–2 districts. However, because hotel use was acceptable at the time of the Hotel's construction and the Hotel has continued to be used as a hotel, hotel use survives as a nonconforming use.[5]

The record is unclear as to when the Hotel's use of Shop # 7 ended and its use for commercial purposes began. As early as 1993, other commercial tenants used Shop # 7 to rent out kayaks, body boards, surfing and other beach equipment. The record fails to establish whether the prior rental businesses constituted an accessory use or a non-accessory use, i.e., whether the customers of these businesses were primarily hotel guests or the general public.

Hedemann began renting Shop # 7 on January 1, 2002. Hedemann both rents and sells equipment but primarily uses the space as "an assembly point for its clients." A "substantial portion" of Hedemann's customers are brought to the location via shuttle from other Waikīkī locations. At Shop # 7, students are issued surfboards and they use the Hotel's property outside Shop # 7 to reach the ocean, where surfing lessons are conducted.[ ]

Although Shop # 7 had been previously used to rent ocean equipment, Hedemann's use of Shop # 7 generated "widespread local opposition." It is unclear from the record when that opposition began, but a petition signed by approximately 700 people objecting to the Surf School's activities was submitted during these proceedings. In particular, area residents complained of noise, congestion, parking issues, vandalism, trespassing and "other ills" caused by the Surf School.

*SDHW*, 119 Hawai'i at 454–56, 198 P.3d at 717–19 (some footnotes omitted).

B. *The Director's Declaratory Ruling*

On March 4, 2004, SDHW filed a petition for a declaratory ruling from the Director of the City and County of Honolulu Department of Planning and Permitting (DPP) on whether the Surf School "operates in compliance with the regulations of the zoning ordinance for nonconformities." In beginning his analysis, the Director set forth the provisions of the Land Use Ordinance (LUO) that relate to nonconforming uses. He quoted LUO § 21–4.110(c)(1), which states that

A nonconforming use shall not extend to any part of the structure or lot which was not arranged or designed for such use at the time of adoption of the provisions of this chapter or subsequent amendment; nor shall the nonconforming use be expanded in any manner, or the hours of

---

"Accessory use" means a use which meets the following conditions:
(1) Is a use which is conducted on the same zoning lot as the principal use to which it is related whether located within the same building or an accessory building or structure, or as an accessory use of land;
(2) Is clearly incidental to and customarily found in connection with the principal use; and
(3) Is operated and maintained substantially for the benefit or convenience of the owners, occupants, employees, customers or visitors of the zoning lot with the principal use.
Land Use Ordinance (LUO) § 21–10.1 (1990).

**5.** At the time the LUO changed the zoning of the Hotel, "a nonconforming use" was defined as:

Any use of a structure or zoning lot which was previously lawful but which does not conform to the applicable use regulations of the district in which it is located, either on the effective date of this Chapter or as a result of any subsequent amendment.
LUO Art. IX. (1983 ed.).
The current definition of "a nonconforming use" is:
"Nonconforming use" means any use of a structure or a zoning lot which was previously lawful but which does not conform to the applicable use regulations of the district in which it is located, either on October 22, 1986 or as a result of any subsequent amendment to this chapter [LUO], or a zoning map amendment.
LUO § 21–10.1.

operation increased. Notwithstanding the foregoing, a recreational use that is accessory to the nonconforming use may be expanded or extended if the following conditions are met:

(A) The recreational accessory use will be expanded or extended to a structure in which a permitted use also is being conducted, whether that structure is on the same lot or an adjacent lot; and

(B) The recreational accessory use is accessory to both the permitted use and the nonconforming use.

The Director then quoted LUO Sec. 21–4.110(c)(4), which governs changes in nonconforming uses, states that

Any nonconforming use may be changed to another nonconforming use of the same nature and general impact, or to a more restricted use, provided that *the change to a more restricted use may be made only if the relation of the use to the surrounding property is such that adverse effects on occupants and neighboring properties will not be greater than if the original nonconforming use continued.*

(Emphasis in original.)

The Director first found that the Surf School was not an accessory use of the Hotel because "[m]ost of the students are not guests of the on-site hotel." *See* LUO § 21–10.1 (" 'Accessory use' means a use which … [i]s operated and maintained substantially for the benefit or convenience of the owners, occupants, employees, customers or visitors of the zoning lot with the principal use."). Rather, the Director concluded that "the use should be considered an 'office' since the primary on-site activity is the assembly and registration of students and the distribution of surf boards to them."

The Director further found that the Surf School was not an expansion of a nonconforming use prohibited by LUO § 21–

4.110(c)(1). He reasoned that the Surf School did not involve "a new structure or the physical expansion of an existing structure" and the hours of the surf school—8:30 a.m. to 5:30 p.m.—could not be considered an expansion of the Hotel's twenty-four hour operation. Instead, the Director found that "the establishment of a surf school on the site more properly represents a 'change in use,' rather than an 'expansion' of the nonconforming use."

To frame his analysis of whether the Surf School was a permissible change in nonconforming use, the Director stated that

current zoning regulations clearly permit changes in nonconforming use under LUO Section 21–4.110(c)(4), provided the change in use does not result in greater adverse effects for occupants and neighboring properties. This means that any of the ground-floor commercial uses on the site considered principal uses, including the surf school, are permissible so long as their impact on surrounding properties is no greater than that of the hotel use.

The Director limited the adverse effects under consideration to the "adverse effects on the various land uses within the neighborhood, including the seawall, rather than on the ocean itself." The Director noted that "[t]he LUO does not stipulate criteria that must be applied to changes in nonconforming use in order to determine whether a greater adverse effect will occur, so changes in nonconforming use must be evaluated on a case-by-case basis." As a result, he analyzed the nonconforming use issue according to the framework provided by "Interpretation No. 88/INT–6, issued by the DPP on December 19, 1988, [which] addresses how changes in nonconforming use can be evaluated by providing guidelines for decision-making on whether a proposed change in use may involve greater adverse effects."[6] The follow-

6. Interpretation number 88/INT–6 (December 19, 1988) provides guidance on how to define "same nature" and "more restricted use":

Each change in use shall be evaluated on a case-by-case basis, using the following guidelines for decision-making:

Hours of operation Are the hours longer or changed in a way which may create conflicts with surrounding conforming uses?

Clientele volume Are more clients or visitors expected to be attracted to the site?

Parking Is the parking standard higher, or is the parking demand expected to be higher?

Traffic Will the new use attract heavier vehicles or greater frequency of vehicle trips?

Noise Is more noise expected? During night hours?

ing portions of the Director's analysis are most relevant to the dispositive issue of this appeal: whether the Surf School's use of the Hotel's premises was a permissible change in nonconforming use under the LUO. As analyzed by the Director:

2. *Clientele Volume:* Information available to the DPP concerning the number of surf school customers ("students") indicates that class size varies greatly.

. . . .

For purposes of this Analysis, *it seems reasonable to conclude that the impact of the change in use to a surf school operating on the grounds of the hotel should be no greater than if it operated as an accessory use of the hotel.* At issue then is the level of activity or intensity of use which results in greater adverse effects. DPP staff observed no significant impacts associated with the surf school activities on the morning they conducted their site visit. At that time, there were only 4 students in the class. On the other hand, a large number of complaints from area residents, over a sustained period of time, clearly indicates that there are adverse effects associated with the surf school's activities, particularly when class size is large. Relevant nuisances include noise (shouting and yelling) and congestion at the seawall. Further, it would be difficult to find that a class involving 30 to 50 students *would be typical for an accessory use of a 124–unit hotel.*

. . . .

The DPP is not aware of any historical adverse effects associated with the operation of the nonconforming hotel on the site similar to those associated with the surf school relative to noise, seawall congestion, and incompatibilities with surrounding and conforming uses on the properties in the surrounding neighborhood. The relationship between the surf school and these adverse effects are apparently associated

Adjacent land uses Compared to the previous non-conforming use, is the proposed use compatible with existing surrounding uses? With conforming use?

with large surfing class size, and should be controlled by limiting class size. If the adverse effects can be controlled by limiting class size, *then the surf school's activities should not have an impact greater than if [the] surf school operated as accessory use of the hotel.* The class size should be limited to no more than 12 students per session, and no more than 3 sessions per day. The surf school operator should also take appropriate actions to minimize congestion along the seawall adjacent to the shoreline in the vicinity of its activities during the periods of its surfing instruction.

Finally, it is the operator's responsibility to comply with these controls. Failure to comply may necessitate a reevaluation by the DPP concerning its conclusions about the ability to mitigate the related adverse effects of the surf school on the surrounding neighborhood. If the adverse effects cannot be adequately controlled as discussed herein, then the conclusions reached by this Analysis may need to be revised accordingly, and, a conclusion that this particular change in nonconforming use cannot be permitted under any conditions.

(Emphasis added.)

Based on the above analysis, the Director made conclusions of law which stated, in relevant part,

F. Since it constitutes a principal use, the surf school

establishment on the site shall be considered a change in nonconforming use for the commercial space specifically identified as Shop No. 7. The change in use is from a principal hotel to office use.

G. There is adequate evidence that the surf school establishment can involve greater adverse effects (in particular seawall congestion, noise, and incompatibility with surrounding residential and apartment uses) on surrounding properties within the neighborhood

Nonconforming commercial accessory uses in Waikiki would be allowed to continue even if the building is converted to apartment use. 88/INT–6 (December 19, 1988).

when the size of a surfing class is too large.

H. The change in nonconforming use, which occurred at the location identified as Shop No. 7, has the potential for greater adverse effects than if the hotel use of that location been [sic] continued, *or if it were operated as an accessory use of the hotel.* Accordingly, the change in use shall not be permitted pursuant to LUO Section 21–4.110(c)(4), unless the size of the surfing classes can be limited such that the adverse effects are no longer a problem. This limit shall be 12 students per class and 3 classes per day; equated to a maximum class size of 15 people (12 students and 3 instructors). If the intensity of use should ever exceed this level, then it shall constitute a zoning violation of LUO Section 21–4.110(c)(4), and the establishment and/or landowners or lessees shall be subject to appropriate enforcement action.

(Emphasis added.)

The Director's Declaratory Ruling stated:

The Hans Hedemann Surf School may operate on the site as a permitted change in nonconforming use (from hotel to office), subject to the provisions of LUO section 21–4.110(c)(4), provided:

A. Its related surfing instruction operations shall not at any time exceed a maximum size of 12 students per class, and 3 classes per day; and

B. The surf school operator shall take appropriate actions to insure that the seawall adjacent to the shoreline in the vicinity of its operations is kept free of congestion during its periods of instruction.

---

7. The circuit court did not reach the other issues in SDHW's appeal:

23. The Court, in light of its decision here, does not reach other issues raised by Petitioners, including the lawfulness of (1) the delegation by the Director of his authority to a private entity; (2) the Director's determination that the change from a hotel use to a commer-

C. *The Zoning Board of Appeals Decision*

SDHW timely appealed to the Zoning Board of Appeals (ZBA) on June 29, 2004. The ZBA subsequently conducted a contested case hearing pursuant to the ZBA's rules and the Administrative Procedure Act, Hawaiʻi Revised Statutes (HRS) chapter 91. The ZBA affirmed the Director's Ruling:

12. The Director's Ruling was not based on an erroneous finding of material fact and was not an arbitrary or capricious [sic], nor did the Director abuse his discretion in concluding that [Hedemann]'s use of the Shop on the [Hotel] Property is a permitted change in nonconforming use.

13. The Director's determination that [Hedemann]'s use of the Shop [# 7] on the [Hotel] Property as an office for surfing instruction, subject to conditions was not based on an erroneous finding of material fact, was neither arbitrary or capricious, nor an abuse of his discretion.

D. *The Circuit Court's Decision and Order*

SDHW appealed to the circuit court. The circuit court vacated the ZBA's decision "insofar as it allows the operation of a commercial surf school at [the Hotel]."

The circuit court focused on "whether the Director has the power to grant a LUO § 21–4.110(c)(4) exception by crafting 'conditions'—in this case by imposing volume restrictions on new use—to mitigate any greater adverse effects on surrounding properties."[7] After considering the issue *de novo*, the circuit court made the following conclusions of law:

14. Whether the Director has the authority under the LUO and the City Charter to craft "conditions" to a change in nonconforming use in order that the adverse effects on neighboring properties will not be greater than the original nonconforming use, and thereby bring a change in noncon-

cial use and then a change from an accessory commercial use to a non accessory commercial [sic] do not constitute a forbidden "expansion of use"; and (3) the Director's finding that the nonconforming surf school use was of the "same nature and general impact" as the hotel use.

forming use within the ambit of the LUO § 21–4.110(c) exception, is a legal question subject to *de novo* review. It requires the interpretation of the governing statutes, including the LUO and the Honolulu Revised City Charter.

15. No provision of the City Charter grants the Director the power to craft conditions to ameliorate adverse effects of a change in nonconforming use on neighboring properties, so that the LUO § 21–4.110(c)(4) exception can be used.

16. No provision in the LUO, and particularly LUO § 21–4.110(c), gives the Director the power to craft conditions to ameliorate adverse effects of a change in nonconforming use on neighboring properties so that the LUO § 21–4.110(c)(4) exception can be used. The ordinance implies the opposite: "Strict limits are placed on nonconforming uses to discourage the perpetuation of these uses and thus facilitate the timely conversion to conforming uses ..."

17. The Director interpreted the LUO § 21–4.110(c) to permit a change from one nonconforming use to a new nonconforming use, notwithstanding adverse effects from the nonconforming use, subject only to conditions he imposes to limit such adverse effects.

18. The Director's interpretation of the LUO grants broad authority to himself to allow certain variances by crafting his own conditions. This interpretation contradicts the City Charter, which imposes a detailed regulatory scheme for allowing variances.

19. The Land Use Ordinance is subordinate to the City Charter. Any interpretation of the LUO which conflicts with the Charter is contrary to law:

> The proposition is self-evident that an ordinance must conform to, be subordinate to, not conflict with, and not exceed the charter, and can no more change or limit the effect of the charter than a legislative act can modify or supersede a provision of the constitution of the state. Ordinances must not only conform with the express terms of the charter, but they must not conflict in

any degree with its object or with the purposes [of the charter].

*Harris v. De Soto,* 80 Hawaiʻi 425, 431, 911 P.2d 60, 66 (1996), citing, *Fasi v. City Council,* 72 Haw. 513, 518, 823 P.2d 742, 744 (1992). *Accord, Neighborhood Board No. 24 (Waianae Coast) v. State Land Use Commission,* 64 Haw., 265, 639 P.2d 1097 (1982).

20. Thus, the Director's interpretation of the LUO to allow a LUO § 2l–4.ll0(c)(4) exception notwithstanding adverse effects of the new nonconforming use on the neighboring parcels and occupants, was in violation of the ordinance itself, in violation of the Revised City Charter, exceeded the Director's authority and the jurisdiction of the agency and the Director's order was made upon unlawful procedure. Accordingly, the determinations of the Director and the ZBA below were contrary to (1) the LUO and (2) the Revised City Charter and (3) in excess of the Director's authority. Pursuant to HRS § 91–14(1), (2) and (3), the determinations of the ZBA are overruled.

22.[sic] The Director's failure to follow the LUO and the Honolulu Revised City Charter has allowed the surf school's operation to continue in spite of the adverse impacts caused by such operation. Given the amount of materials submitted in the record cataloguing adverse impacts associated with the surf school and the lengthy period the surf school has been operating on the Property, the Court finds that substantial rights of the Petitioners have been prejudiced.

In the circuit court's Amended Final Judgment on Administrative Appeal, Vacating and Modifying Decision of the Zoning Board of Appeals Number 2004/ZBA–04, it stated that:

> Pursuant to Hawaiʻi Revised Statutes § 91–14, it is hereby ordered, adjudged, and decreed that [SDHW]'s appeal is granted and the court hereby:
>
> 1. Vacates the June 3, 2005 decision of the [ZBA] ... insofar as it allows the operation of a commercial surf school operation at or on [Hotel's property] in

derogation of it's a–2 Medium Density Apartment District Zoning:

2. Modifies the June 3, 2005 decision of the ZBA in ZBA matter number 2004/ZBA–04, by inserting the following:

The Director of the Department of Planning and Permitting's declaratory ruling that the Hans Hedemann Surf School may operate on the grounds of the New Otani Kaimana Beach Hotel [sic] a permitted change in nonconforming use (from hotel to office), subject to the provisions on [sic] ROH § 21–4.110(c), was arbitrary and/or capricious and constituted an abuse of discretion.

3. Orders Respondent/Appellee City and County of Honolulu, by and through the Zoning Board of Appeals and the Department of Planning and Permitting, to take all necessary actions to effectuate this order[.]

(Some internal capitalization modified.)

E. *The ICA's Opinion*

The Surf School appealed to the ICA. The ICA reversed the circuit court's judgement, concluding that the Director had discretion to grant the impact-ameliorating conditions and did not abuse his discretion in finding that the Surf School's use of Shop # 7 constituted a valid change in nonconforming use of Shop # 7 because the "ruling was reasonably based on the evidence before the Director and constituted a reasonable application of the applicable zoning ordinance and the DPP's previous interpretation of that ordinance." *SDHW*, 119 Hawai'i at 465, 198 P.3d at 728.

## II. *STANDARDS OF REVIEW*

A. *Appeal from the ZBA*

The ZBA is the administrative agency designated to hear and determine appeals from the director's actions in the administration of the City and County of Honolulu zoning code. *Price v. Zoning Bd. of Appeals of the City and County of Honolulu*, 77 Hawai'i 168, 175, 883 P.2d 629, 636 (1994). Thus, the ZBA's order was an administrative decision subject to review by the circuit court. Hawai'i Revised Statutes (HRS) § 91–14(a).

*Windward Marine Resort, Inc. v. Sullivan*, 86 Hawai'i 171, 177, 948 P.2d 592, 598 (App. 1997).

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) (1993) to the agency's decision.

*Citizens Against Reckless Dev. v. Zoning Bd. of Appeals*, 114 Hawai'i 184, 193, 159 P.3d 143, 153 (2007) (citing *Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan*, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998)). HRS § 91–14(g), "Judicial review of contested cases," provides:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (1993). " 'Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); [findings of fact] are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6).' " *Paul v. Dep't of Transp.*, 115 Hawai'i 416, 426, 168 P.3d 546, 556 (2007) (internal brackets omitted) (quot-

ing *Konno v. County of Hawai'i,* 85 Hawai'i 61, 77, 937 P.2d 397, 413 (1997)). "A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." *Del Monte Fresh Produce (Hawaii), Inc. v. International Longshore and Warehouse Union, Local 142, AFL–CIO,* 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006) (internal brackets and quotation marks omitted) (quoting *Price v. Zoning Bd. of Appeals of City and County of Honolulu,* 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994)).

B. *Interpretation of the Revised Ordinances of Honolulu and the Charter of the City and County of Honolulu*

We have stated that:

When interpreting municipal ordinances, we apply the same rules of construction that we apply to statutes. While an administrative agency's interpretation of the ordinance that it is responsible for implementing is normally accorded great weight, no deference is required when the agency's interpretation conflicts with or contradicts the manifest purpose of the ordinance it seeks to implement.

*Colony Surf, Ltd. v. Dir. of Dept. of Planning & Permitting,* 116 Hawai'i 510, 514, 174 P.3d 349, 353 (2007) (quoting *City & County of Honolulu v. Hsiung,* 109 Hawai'i 159, 172, 124 P.3d 434, 447 (2005)).

 This court reviews the interpretation of a statute *de novo.* *Hawai'i Org. of Police Officers v. Soc'y of Prof. Journalists– Univ. of Hawai'i Chapter,* 83 Hawai'i 378, 402, 927 P.2d 386, 410 (1996). Statutory construction is guided by established rules:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.

Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

*Peterson v. Hawai'i Elec. Light Co., Inc.,* 85 Hawai'i 322, 327–28, 944 P.2d 1265, 1270–71 (1997), *superseded on other grounds by* HRS § 269-15.5 (Supp.1999) (block quotation format, brackets, citations, and quotation marks omitted).

 Likewise, "[t]he interpretation of [a] charter is similar to the interpretation of a statute." *Maui County Council v. Thompson,* 84 Hawai'i 105, 106, 929 P.2d 1355, 1356 (1996). Specifically,

[i]n interpreting a zoning ordinance [under the LUO], the duty of this court is to ascertain and give effect to the intent of the Honolulu city council.... Legislative intent should be determined, if possible, from the language of the ordinance, and the language must be read in the context of the entire ordinance and construed in a manner consistent with the purposes of the ordinance.

*State v. Lum,* 8 Haw.App. 406, 410, 807 P.2d 40, 43 (1991) (citations omitted).

## III. *DISCUSSION*

As noted earlier herein, the dispositive issue is whether the Surf School's use of Shop # 7 of the Hotel's premises was a permissible change in nonconforming use (from hotel to office) under the LUO. For the following reasons, we hold that the Director's mixed finding of fact and conclusion of law that the Surf School's use of the Hotel's premises was a permissible change in nonconforming use was clearly erroneous as it is not supported in the record.

A. *Purpose of the LUO*

The stated purpose and intent of the LUO is as follows:

(a) The purpose of the LUO is to regulate land use in a manner that will encourage orderly development in accordance with adopted land use policies, including the Oahu general plan and development plans, and to promote and protect

the public health, safety and welfare by, more particularly:

(1) Minimizing adverse effects resulting from the inappropriate location, use or design of sites and structures;

(2) Conserving the city's natural, historic and scenic resources and encouraging design which enhances the physical form of the city; and

(3) Assisting the public in identifying and understanding regulations affecting the development and use of land.

LUO § 21–1.20(a)(1).

B. *Permissible Nonconforming Uses Under the LUO*

Notwithstanding the stated purpose of the LUO, HRS § 46–4 requires that the counties permit certain nonconforming uses: "Neither this section nor any ordinance enacted pursuant to this section shall prohibit the continued lawful use of any building or premises for any trade, industrial, residential, agricultural, or other purpose for which the building or premises is used at the time this section or the ordinance takes effect." HRS § 46–4(a) (1993). The burden to prove that a nonconforming use is valid is on the "owner, occupant or user," who must "prove that a lot, a structure, a use, a dwelling unit, or parking or loading was *legally established as it now exists*." LUO § 21–4.110 (emphasis added).

At the county level "[s]trict limits are placed on nonconforming uses to discourage the perpetuation of these uses, and thus facilitate the timely conversion to conforming uses." LUO § 21–4.110(c). *See also* LUO § 21–4.110 ("Constraints are placed on nonconformities to facilitate eventual conformity with the provisions of [the LUO].").

Several provisions of the LUO regulate nonconforming uses. According to the LUO,

[a] nonconforming use shall not extend to any part of the structure or lot which was not arranged or designed for such use at the time of adoption of the provisions of this chapter or subsequent amendment; nor shall the nonconforming use be expanded in any manner, or the hours of operation increased.

LUO § 21–4.110(c)(1). However, the LUO allows for changes in nonconforming uses that do not conflict with LUO § 21–4.110(c)(1). *See* LUO § 21–4.110(c)(4) (providing conditions that must be satisfied to support a permissible change in nonconforming use).

Even if a valid nonconforming use existed at the time the zoning changed, that use will be terminated if there is an extended discontinuation of the nonconforming use. LUO § 21–4.110(c)(2) provides that:

Any nonconforming use that is discontinued for any reason for 12 consecutive months, or for 18 months during any three-year period, shall not be resumed; however, a temporary cessation of the nonconforming use for purposes of ordinary repairs for a period not exceeding 120 days during any 12–month period shall not be considered a discontinuation.

LUO § 21–4.110(c)(2). It logically follows that once a nonconforming use is terminated there can no longer be a change in nonconforming use based on the terminated use.

This court construes zoning ordinances under the LUO *in pari materia*. *See Colony Surf*, 116 Hawai'i at 516, 174 P.3d at 355; *Waikiki Marketplace v. Zoning Bd. of Appeals*, 86 Hawai'i 343, 354, 949 P.2d 183, 194 (App.1997). Based on the provisions of the LUO pertaining to nonconforming uses, the party who is arguing for a change in nonconforming use bears the burden to demonstrate that the prior nonconforming use (1) was an original conforming use of the premises that was established before the change in zoning; or (2) was the result of a valid change in nonconforming use from a prior valid nonconforming use; and (3) neither the original nonconforming use nor the prior nonconforming use has been discontinued. *See* LUO § 21–4.110(c)(2), (4).

C. *The Record Does Not Support a Finding That The Surf School Was a Permissible Change in Nonconforming Use*

Central to the determination of whether a change in nonconforming use is permissible is an analysis of whether the prior nonconforming use was legally established.

In this case, the Director compared the Surf School's use of Shop # 7 with a prior nonconforming accessory use of the hotel. Specifically, the Director stated:

[f]or purposes of this Analysis, *it seems reasonable to conclude that the impact of the change in use to a surf school operating on the grounds of the hotel should be no greater than if it operated as an accessory use of the hotel* ... Further, it would be difficult to find that a class involving 30 to 50 students *would be typical for an accessory use of a 124-unit hotel.*

(Emphases added.) Additionally, he stated that "if the adverse effects can be controlled by limiting class size, *then the surf school's activities should not have an impact greater than if [the] surf school operated as accessory use of the hotel.*" (Emphasis added.) Moreover, the Director's conclusions of law state that "[t]he change in nonconforming use, which occurred at the location identified as Shop No. 7, has the potential for greater adverse effects than if the hotel use of that location been [sic] continued, *or if it were operated as an accessory use of the hotel.*" (Emphasis added.)

The Director erred when he compared the Surf School's impact to that of "an accessory use of the hotel," because the Director could only weigh the Surf School's impact against a *legally established* prior nonconforming use. Here, the Surf School's use of Shop # 7 cannot be compared to "an accessory use of the Hotel" because the Surf School did not meet its burden to prove that there was a legally established prior nonconforming accessory use of Shop # 7. In other words, the Surf School did not establish (1) that there was a valid accessory use of Shop # 7 by the Hotel before the 1969 Comprehensive Zoning Code changed the Hotel's zoning from Hotel and Apartment District "L" to A-4 Apartment District; or (2) there was a valid accessory use of Shop # 7 before the LUO changed the Hotel's zoning from A-4 Apartment District to its current A-2 Medium Density Apartment District designation.

There is no evidence in the record that there was a legally established accessory use of Shop # 7 prior to the LUO. The only prior commercial use of Shop # 7 in the record was the use of Shop # 7 as a beach equipment rental shop. However, as stated by the ICA,

The record is unclear as to when the Hotel's use of Shop # 7 ended and its use for commercial purposes began. As early as 1993, other commercial tenants used Shop # 7 to rent out kayaks, body boards, surfing and other beach equipment. The record fails to establish whether the prior rental businesses constituted an accessory use or a non-accessory use, i.e., whether the customers of these businesses were primarily hotel guests or the general public.

*SDHW*, 119 Hawai'i at 456, 198 P.3d at 719. As the record does not support a finding that the beach equipment rental use was an accessory use of the Hotel, it cannot be considered a valid prior nonconforming accessory use of Shop # 7. Even assuming that the beach equipment rental use was a valid accessory use of the Hotel, the Surf School has only shown that the use was uninterrupted since 1993. Therefore, the Surf School has not met its burden to show a "legally established" prior nonconforming accessory use of Shop # 7. *See* LUO § 21-4.110. As a result, the Director erred in comparing the Surf School's use of Shop # 7 to that of a prior nonconforming accessory use of the hotel.[8]

Based on the foregoing, the Director's mixed finding of fact and conclusion of law that a change in nonconforming use was permissible under LUO § 21-4.110(c)(4) was not supported in the record. As a result, the ICA erred when it concluded that the Director's ruling "was reasonably based on the evidence before the director and constituted a reasonable application of the applicable zoning ordinance and the DPP's previous interpretation of that ordinance." *SDHW*, 119 Hawai'i at 465, 198 P.3d at 728.

---

8. Thus, the only legally established prior nonconforming use on record was the nonconforming hotel use. Although the Director stated that "any of the ground-floor commercial uses on the [Hotel] site considered principal uses, including the surf school, are permissible as long as their impact on surrounding properties is no greater than that of the *hotel use,*" it is clear from his analysis that he did not follow this standard.

D. *SDHW's Other Issues*

Because the Director's ruling was clearly erroneous, we need not consider any of SDHW's additional arguments.

## IV. CONCLUSION

Accordingly, we vacate the ICA's Opinion and affirm the circuit court's amended final judgment but on different grounds, namely that the Director's mixed finding of fact and conclusion of law that the Surf School's use of Shop # 7 was a permissible change in nonconforming use was clearly erroneous as it was not supported in the record.